## MINNESOTA *v.* HITCHCOCK.

### ORIGINAL.

No. 4. Original. Argued November 1, 4, 1901.—Decided May 5, 1902.

The original jurisdiction, vested by the Constitution in this court over controversies in which a State is a party, is not affected by the question whether the State is a party plaintiff or party defendant.

A dispute as to the title to real estate is a question of a justiciable nature, and can properly be determined in a judicial proceeding.

The United States are to be taken, for the purposes of this case, as the real party in interest adverse to the State.

This court has jurisdiction of this controversy, and is called upon to determine the case on its merits.

Not only the technical rules of statutory construction, but also the general scope of the legislation in these matters, and the policy of the United States in respect to public schools, and also to Indians, concur in sustaining the contention of the Government that none of these ceded lands passed under the school grant to the State.

The court is of opinion that the claim of Minnesota to these lands cannot be sustained, and that the bill should be dismissed.

THIS is a suit in equity, commenced in this court by the State of Minnesota to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from selling any sections 16 and 36 in what was on January 14, 1889, known as the Red Lake Indian reservation.

By the bill, answer and an agreed statement the following facts appear : By section 18 of the act to establish the territorial government of Minnesota, approved March 3, 1849, 9 Stat. 403, it was enacted "that when the lands in the said Territory shall be surveyed under the direction of the Government of the United States, preparatory to bringing the same into market, sections numbered 16 and 36 in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory and in the States and Territories hereafter to be erected out of the same."

On February 26, 1856, the legislature of the Territory of Minnesota sent a memorial to Congress for the relief of settlers upon school lands, Laws, Minn. 1856, p. 368, which reads :

" To the Honorable the Senate and House of Representatives of the United States in Congress assembled:

" The memorial of the legislative assembly of the Territory of Minnesota respectfully represents:

" That under the provisions of the act of Congress, extending the provisions of the preëmption law of 1841, over the unsurveyed lands of Minnesota, many of our settlers have heavy investments, both of money and labor, in the opening of farms, erection of buildings, and the laying out and improving of townsites, (lots in which said townsites were frequently transferred before the government survey, at high prices, to the occupants thereof,) who were found, when the government survey was made, to be upon the school sections, and that the said settler had no means of ascertaining previous to the survey where the school sections would come.

" That it is a great injustice and hardship to compel such persons to repurchase or lose entirely the improvements and homes, made by themselves in good faith, in the expectation of preëmpting or entering them according to the provisions of the statute. Therefore, your memorialists would respectfully request your honorable body to pass an act, giving such persons in this Territory as have, previously to the government survey, settled upon the school sections, (and have otherwise the right of preëmption,) the right to preëmpt the same, as other government lands are preëmpted. And also providing for the entry of the townsites in this Territory, which are on school sections and were occupied as such, previous to the government survey, as other townsites upon unoffered government lands are entered.

" And also allowing the county commissioners of the county in which such lands may be situate to enter in lieu thereof, for the benefit of the school fund of the township in which such land so as aforesaid settled or occupied may be, and without charge, an equal amount of such surveyed lands, subject either to private entry or preëmption, in the same land district as they may select.

" And as in duty bound your memorialists will ever pray."

In response to this memorial Congress passed the following joint resolution, March 3, 1857, 11 Stat. 254:

" That where any settlements, by the erection of a dwelling house or the cultivation of any portion of the land, shall have been or shall be made upon the sixteenth or thirty-sixth sections (which sections have been reserved by law for the purpose of being applied to the support of schools in the Territories of Minnesota, Kansas and Nebraska, and in the States and Territories hereafter to be erected out of the same) before the said sections shall have been or shall be surveyed ; or when such sections have been or may be selected or occupied as townsites, under and by virtue of the act of Congress approved twenty-third of May, eighteen hundred and forty-four, or reserved for public uses before the survey, then other lands shall be selected by the proper authorities, in lieu thereof, agreeably to the provisions of the act of Congress approved twentieth May, eighteen hundred and twenty-six, entitled ' An act to appropriate lands for the support of schools in certain townships and fractional townships not before provided for.' And if such settler can bring himself, or herself, within the provisions of the act of fourth of September, eighteen hundred and forty-one, or the occupants of the townsite be enabled to show a compliance with the provisions of the law of twenty-third of May, eighteen hundred and forty-four, then the right of preference granted by the said acts, in the purchase of such portion of the sixteenth or thirty-sixth sections, so settled and occupied, shall be in them respectively, as if such sections had not been previously reserved for school purposes."

On February 26, 1857, Congress passed an act authorizing the formation of a state government.  11 Stat. 166.  Section 5, so far as is applicable, is as follows :

" And be it further enacted, That the following propositions be, and the same are hereby, offered to the said convention of the people of Minnesota for their free acceptance or rejection, which, if accepted by the convention, shall be obligatory on the United States and upon the said State of Minnesota, to wit :

" First, That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools."

On October 13, 1857, a constitution was formed, in which, by section 3 of article 2 the foregoing proposition was accepted in this language :

" The propositions contained in the act of Congress entitled ' An act to authorize the people of the Territory of Minnesota to form a constitution and state government, preparatory to their admission into the Union on an equal footing with the original States,' are hereby accepted, ratified and confirmed, and shall remain irrevocable without the consent of the United States ; and it is hereby ordained that this State shall never interfere with the primary disposal of the soil within the same, by the United States, or with any regulations Congress may find necessary for securing the title to said soil to *bona fide* purchasers thereof ; and no tax shall be imposed on lands belonging to the United States, and in no case shall non-resident proprietors be taxed higher than residents."

By an act of date May 11, 1858, 11 Stat. 285, Minnesota was admitted into the Union. In that it was recited " that the State of Minnesota shall be one, and is hereby declared to be one, of the United States of America, and admitted into the Union on an equal footing with the original States in all respects whatever."

At the date of this admission a large part of the territory in the northwestern part of the State, including the tracts in controversy, was and for a long time thereafter remained unceded Indian lands, subject to the Indian title of occupancy. It was, among other things, stipulated in the agreed statement:

" That except as its status may have been affected or changed by the treaty of October 2, 1863, 13 Stat. 667, by the President's order of March 18, 1879, enlarging what was then known as the White Earth Indian reservation, by the act of Congress of January 14, 1889, 25 Stat. 642, or by the act of Congress of June 2, 1890, 26 Stat. 126, or by one or more of these, the district or country embracing the lands in controversy continued to be unceded Indian lands subject to the original right of occupancy of the Chippewa Indians up to the time of the action had on March 4, 1890, under the said act of January 14, 1889."

Referring to the matter stated in this stipulation, it may be

noticed that by the treaty of October 2, 1863, the Red Lake and Pembina bands of Chippewa Indians dwelling in northwestern Minnesota ceded lands within certain defined boundaries to the United States, and in article 6 of the treaty the portion of the territory occupied by them and not ceded is spoken of as a reservation, for by it the President was required to appoint a board of visitors, " whose duty it shall be to attend at all annuity payments of the said Chippewa Indians, to inspect their fields and other improvements, and to report annually thereon on or before the first day of November, and also as to the qualifications and moral deportment of all persons residing upon the reservation under the authority of law."

This tract was thereafter known as the Red Lake Indian reservation, and is referred to in the President's order of March 18, 1879, in which he bounds a proposed reservation on one side by the "Red Lake Indian reservation." The act of June 2, 1890, 26 Stat. 126, grants to the Duluth and Winnipeg Railroad Company a right of way through the "Red Lake (and other) reservations." The second section of the act provides the mode of fixing the compensation to be paid the Indians for the right of way, and that no right of way shall vest in the company until, among other things, "the consent of the Indians on said reservation as to the amount of said compensation and right of way shall have been first obtained in a manner satisfactory to the President of the United States." On January 14, 1889, an act was passed, 25 Stat. 642, providing for a commission to negotiate with all the bands or tribes of Chippewa Indians in Minnesota for the cession and relinquishment, " for the purposes and upon the terms" stated in the act, and subject to the approval of the President, " of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts."

That act directed that all the Chippewa Indians in Minnesota, " except those on the Red Lake reservation," were to be removed to and allotted lands in the White Earth reservation,

and those on the Red Lake reservation were to be allotted lands on so much of that reservation as should be reserved by the commission for that purpose. The ceded lands were thereafter to be surveyed, inspected, classified as agricultural or pine lands, the latter appraised by 40-acre tracts and sold at vendue, and the agricultural lands disposed of to actual settlers at $1.25 per acre. The proceeds arising from the disposition of the two classes of land were to be held and applied as directed in section 7, which reads:

"That all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made, and which interest and permanent fund shall be expended for the benefit of said Indians in manner following: One half of said interest shall, during the said period of fifty years, except in the cases hereinafter otherwise provided, be annually paid in cash in equal shares to the heads of families and guardians of orphan minors for their use; and one fourth of said interest shall, during the same period and with the like exception, be annually paid in cash in equal shares per capita to all other classes of said Indians; and the remaining one fourth of said interest shall, during the said period of fifty years, under the direction of the Secretary of the Interior, be devoted exclusively to the establishment and maintenance of a system of free schools among said Indians, in their midst and for their benefit; and at the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares: *Provided*, That Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among the said Indians,

a portion of said principal sum, not exceeding five per centum thereof. The United States shall, for the benefit of said Indians, advance to them as such interest as aforesaid the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made until such time as said permanent fund, exclusive of the deductions hereinbefore provided for, shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime accrue from accumulations of said permanent fund; the payments of such interest to be made yearly in advance, and, in the discretion of the Secretary of the Interior, may, as to three fourths thereof, during the first five years be expended in procuring live stock, teams, farming implements, and seed for such of the Indians, to the extent of their shares, as are fit and desire to engage in farming, but as to the rest, in cash; and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess for all the advances of interest made as herein contemplated and other expenses hereunder."

Under this act a commission was appointed and an agreement made with the Indians for a cession of a large part of the Red Lake Indian reservation, which agreement was approved by the President, March 4, 1890, the unceded portion being reserved by the commissioners "for the purpose of making and filling the allotments" provided for in the act.

According to the agreed statement of facts the lands in the reservation were wholly unsurveyed at the time of the passage of this last act, January 14, 1889, and until after the approval of the agreement for this cession, March 4, 1890.

On February 28, 1891, 26 Stat. 796, Congress passed this act:

"Where settlements with a view to preëmption or homestead have been or shall hereafter be made, before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the claims of such settlers; and if such sections, or either of them, have been or shall be granted, reserved, or pledged for the use of schools or colleges in the State or Territory in which they lie, other lands of equal acreage are hereby appropriated and

granted, and may be selected by said State or Territory, in lieu of such as may be thus taken by preëmption or homestead settlers. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said State or Territory, where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States: *Provided*, Where any State is entitled to said sections sixteen and thirty-six, or where said sections are reserved to any Territory, notwithstanding the same may be mineral land or embraced within a military, Indian, or other reservation, the selection of such lands in lieu thereof by said State or Territory shall be a waiver of its right to said sections. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said State or Territory to compensate deficiencies for school purposes, where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional, or from any natural cause whatever. And it shall be the duty of the Secretary of the Interior, without awaiting the extension of the public surveys, to ascertain and determine, by protraction or otherwise, the number of townships that will be included within such Indian, military, or other reservations, and thereupon the State or Territory shall be entitled to select indemnity lands to the extent of two sections for each of said townships, in lieu of sections sixteen and thirty-six therein ; but such selections may not be made within the boundaries of said reservations: *Provided, however,* That nothing herein contained shall prevent any State or Territory from awaiting the extinguishment of any such military, Indian, or other reservation and the restoration of the lands therein embraced to the public domain and then taking the sections sixteen and thirty-six in place therein ; but nothing in this proviso shall be construed as conferring any right not now existing."

Upon these facts the State contends that the territory in question was not an Indian reservation, but what is known as unceded Indian country, subject to the original right of occupancy by the Chippewa Indians, and also that whether the country

was an Indian reservation or unceded Indian country it was subject to the grant of sections 16 and 36 to the State when the Indian right of occupancy was extinguished.

Defendants' contentions are :

1. That this tract of country was a reservation, set apart and appropriated to the uses of the civilization and support of the Indians.

2. That these lands never became " public lands," and so never became subject to the State's school land grant.

3. That the school land grant attached to no particular lands until surveyed. Until then the specific sections remained subject to disposition by Congress, the State, in the event of such disposition, being remitted to the selection of other lands as indemnity. Especially did the joint resolution of March 3, 1857, subject these sections in Minnesota to reservation for public uses at any time before survey, and, in the event of any such reservation, make the State's grant, to that extent, one of indemnity lands.

4. That the act of January 14, 1889, and the agreement negotiated thereunder with the Indians, dedicated and appropriated all the lands in the Red Lake reservation exclusively to the civilization, education and support of the Indians. This was a disposal of the lands within the meaning of the enabling act of February 26, 1857, and in any event was a reservation of them for public uses under the joint resolution of March 3, 1857.

5. That in interpreting the act of 1889, it is of no moment that the State has a system of common schools aided by a grant of lands from the General Government. That act in terms keeps the education of these Indians under national control, and dedicates a portion of the proceeds of the sale of these lands " exclusively to the establishment and maintenance of a system of free schools among said Indians, in their midst and for their benefit."

6. That in determining whether the act of 1889 and the agreement negotiated thereunder were intended to appropriate sections 16 and 36, along with the other lands, to the civilization, education and support of the Indians, inquiry must be made as to how the act and agreement were understood by the Indians.

*Mr. Frank B. Kellogg* and *Mr. Henry W. Childs* for complainant. *Mr. C. A. Severance*, *Mr. Robert E. Olds* and *Mr. W. B. Douglas* were on their brief.

*Mr. Willis Van Devanter* for defendants.

MR. JUSTICE BREWER delivered the opinion of the court.

A preliminary question is one of jurisdiction. It is true counsel for defendants did not raise the question; and evidently both parties desire that the court should ignore it and dispose of the case on the merits. But the silence of counsel does not waive the question, nor would the express consent of the parties give to this court a jurisdiction which was not warranted by the Constitution and laws. It is the duty of every court of its own motion to inquire into the matter irrespective of the wishes of the parties, and be careful that it exercises no powers save those conferred by law. Consent may waive an objection so far as respects the person, but it cannot invest a court with a jurisdiction which it does not by law possess over the subject matter. The question having been suggested by the court, a brief has been presented, and our jurisdiction sought to be sustained on several grounds. The question is one of the original and not of the appellate jurisdiction. The pertinent constitutional provisions are found in section 2 of article III, as follows:

"The judicial power shall extend to all cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign States, citizens or subjects.

"In all cases affecting ambassadors, other public ministers

and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make."

The first of these paragraphs defines the matters to which the judicial power of the United States extends, and the second divides the original and appellate jurisdiction of this court. By the latter paragraph this court is given original jurisdiction of those cases " in which a State shall be a party." This paragraph, distributing the original and appellate jurisdiction of this court, is not to be taken as enlarging the judicial power of the United States or adding to the cases or matters to which by the first paragraph the judicial power is declared to extend. The question is, therefore, not finally settled by the fact that the State of Minnesota is a party to this litigation. It must also appear that the case is one to which by the first paragraph the judicial power of the United States extends. There are three clauses in the first paragraph which call for notice; one, that which extends the judicial power of the United States to controversies "between a State and citizens of another State;" second, that which extends it " to all cases in law and equity arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;" and, third, that which extends it to controversies "to which the United States shall be a party." To bring the case within the first clause referred to, the bill alleges that the defendant, Ethan Allen Hitchcock, Secretary of the Interior, is a citizen of Missouri, and the defendant, Binger Herman, Commissioner of the General Land Office, a citizen of Oregon, and therefore it is said the case comes strictly within the language of the first paragraph in that there is presented a controversy between a State, Minnesota, and citizens of other States. To that it may be replied that there is no real controversy between the State, the plaintiff, and the defendants as individuals; that the latter, merely as citizens, have no interest in the controversy for or against the plaintiff; that in case either of the defendants should die or resign and a citizen of Minnesota be

appointed in his place, the jurisdiction of the court would cease, and this although the real parties in interest remain the same. In respect to the second it may be said that if it were held that this court had original jurisdiction of every case of a justiciable nature in which a State was a party and in which was presented some question arising under the Constitution, laws of the United States, or treaties made under their authority, many cases, both of a legal and an equitable nature, in respect to which Congress has provided no suitable procedure, would be brought within its cognizance. To this it may be replied that this court cannot deny its jurisdiction in a case to which it is extended by the Constitution. As to the third, it may be objected that the United States is not in terms a party to the litigation and has no pecuniary interest in the controversy, it being in reality one between the State and the Indians.

We omit, as unnecessary to the disposition of this case, any consideration of the applicability of the first two clauses, because we think the case comes within the scope of the third clause, and we need not now go further. This is a controversy to which the United States may be regarded as a party. It is one, therefore, to which the judicial power of the United States extends. It is, of course, under that clause a matter of indifference whether the United States is a party plaintiff or defendant. It could not fairly be adjudged that the judicial power of the United States extends to those cases in which the United States is a party plaintiff and does not extend to those cases in which it is a party defendant.

The case of *United States* v. *Texas*, 143 U. S. 621, is in point, and upon many aspects of the question very suggestive. That was a suit brought by the United States against the State of Texas to determine the title to a tract, called the county of Greer, which was claimed by the State to be within its limits and a part of its territory, and by the United States to be outside the State of Texas and belonging to the United States. The jurisdiction of this court was challenged, but was sustained. After referring to the provisions of the Constitution and the judiciary act of 1789, Mr. Justice Harlan, speaking for the court, said:

" The words in the Constitution, 'in all cases . . . in which a State shall be a party, the Supreme Court shall have original jurisdiction,' necessarily refer to all cases mentioned in the preceding clause in which a State may be made, of right, a party defendant, or in which a State may, of right, be a party plaintiff.

\*   \*   \*   \*   \*   \*   \*   \*

" It is, however, said that the words last quoted refer only to suits in which a State is a party, and in which, also, the opposite party is another State of the Union or a foreign State. This cannot be correct, for it must be conceded that a State can bring an original suit in this court against a citizen of another State. *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 287. Besides, unless a State is exempt altogether from suit by the United States, we do not perceive upon what sound rule of construction suits brought by the United States in this court— especially if they be suits the correct decision of which depends upon the Constitution, laws or treaties of the United States— are to be excluded from its original jurisdiction as defined by the Constitution. That instrument extends the judicial power of the United States 'to *all* cases,' in law and equity, arising under the Constitution, laws and treaties of the United States, and to controversies in which the United States shall be a party, and confers upon this court original jurisdiction 'in *all* cases' 'in which a State shall be party,' that is, in all cases mentioned in the preceding clause in which a State may, of right, be made a party defendant, as well as in all cases in which a State may, of right, institute a suit in a court of the United States. The present case is of the former class. We cannot assume that the framers of the Constitution, while extending the judicial power of the United States to controversies between two or more States of the Union, and between a State of the Union and foreign States, intended to exempt a State altogether from suit by the General Government. They could not have overlooked the possibility that controversies, capable of judicial solution, might arise between the United States and some of the States, and that the permanence of the Union might be endangered if to some tribunal was not entrusted the power to determine

them according to the recognized principles of law. And to what tribunal could a trust so momentous be more appropriately committed than to that which the people of the United States, in order to form a more perfect Union, establish justice and insure domestic tranquillity, have constituted with authority to speak for all the people and all the States, upon questions before it to which the judicial power of the nation extends? It would be difficult to suggest any reason why this court should have jurisdiction to determine questions of boundary between two or more States, but not jurisdiction of controversies of like character between the United States and a State." (p. 643.)

While the United States as a government may not be sued without its consent, yet with its consent it may be sued, and the judicial power of the United States extends to such a controversy. Indeed, the whole jurisdiction of the Court of Claims rests upon this proposition.

It may be said that the United States is not named as defendant, and therefore it cannot be considered a party to the controversy. It is true that it was at one time held that the Eleventh Amendment to the Constitution of the United States, which provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State," was applicable only to cases in which the State was named in the record as a party defendant. *Osborn* v. *United States Bank*, 9 Wheat. 738. But later rulings have modified that decision, and held that the amendment applies to any suit brought in name against an officer of the State, when "the State, though not named, is the real party against which the relief is asked, and the judgment will operate." *In re Ayers*, 123 U. S. 443. Of course, this statement has no reference to and does not include those cases in which officers of the United States are sued, in appropriate form, to compel them to perform some ministerial duty imposed upon them by law, and which they wrongfully neglect or refuse to perform. Such suits would not be deemed suits against the United States within the rule that the Government cannot be sued except by its consent, nor within the rule established in the *Ayers* case.

Now, the legal title to these lands is in the United States. The officers named as defendants have no interest in the lands or the proceeds thereof. The United States is proposing to sell them. This suit seeks to restrain the United States from such sale, to divest the Government of its title and vest it in the State. The United States is, therefore, the real party affected by the judgment and against which in fact it will operate, and the officers have no pecuniary interest in the matter. If whether a suit is one against a State is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered, the same rule must apply to the United States. The question whether the United States is a party to a controversy is not determined by the merely nominal party on the record but by the question of the effect of the judgment or decree which can be entered.

But, it may be said, that the United States has no substantial interest in the lands; that it holds the legal title under a contract with the Indians and in trust for their benefit. This is undoubtedly true, and if the case stood alone upon the construction of the treaty between the United States and the Indians there might be substantial force in this suggestion. But Congress has, for the Government, assumed a personal responsibility. On March 2, 1901, it passed the following act:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in any suit heretofore or hereafter instituted in the Supreme Court of the United States to determine the right of a State to what are commonly known as school lands within any Indian reservation or any Indian cession where an Indian tribe claims any right to or interest in the lands in controversy, or in the disposition thereof by the United States, the right of such State may be fully tested and determined without making the Indian tribe, or any portion thereof, a party to the suit, if the Secretary of the Interior is made a party thereto; and the duty of representing and defending the right or interest of the Indian tribe, or any portion thereof, in the matter shall devolve upon the Attorney General upon the request of such Secretary." 31 Stat. 950.

It has by this legislation in effect declared that the Indians, although the real parties in interest, need not be made parties to the suit; that the United States will, for the purposes of the litigation, stand as the real party in interest, and so far as it could within constitutional limits has expressed the consent of the Government to the maintenance of this suit in this court. By the act it, in effect, declares that it waives all objections on the ground that it is a mere trustee; that it assumes the full responsibilities of ownership, and that it will, whatever may be the outcome of any litigation, stand responsible to the Indians for the full value of the lands in controversy. Can the court say that the United States may not assume such responsibility; may not waive all objections on account of the mere matter of trusteeship, and stand in court as the responsible owner, against whom all litigation may be directed? If it stands as such owner, then within the proposition heretofore referred to a suit which is against its agents, not affecting them individually, but affecting only its title to the real estate, is in substance and effect a suit against the United States. The controversy is made by the act of 1901 one to which the United States is a party in interest, to be directly affected by the result, and, therefore, the case is within the first paragraph, as one to which the judicial power of the United States extends.

Our conclusion, therefore, is that the original jurisdiction vested by the Constitution in this court over controversies in which a State is a party is not affected by the question whether the State is party plaintiff or party defendant; that a dispute as to the title to real estate is a question of a justiciable nature, and can properly be determined in a judicial proceeding; and that the United States is to be taken, for the purposes of this case, as the real party in interest adverse to the State. We are of opinion, therefore, that this court has jurisdiction of this controversy, and is called upon to determine the case upon its merits.

We pass, therefore, to a consideration of such merits.

Whether this tract, which was known as the Red Lake Indian reservation, was properly called a reservation, as the defendant contends, or unceded Indian country, as the plaintiff insists, is

a matter of little moment. Confessedly the fee of the land was in the United States, subject to a right of occupancy by the Indians. That fee the Government might convey, and whenever the Indian right of occupancy was terminated (if such termination was absolute and unconditional) the grantee of the fee would acquire a perfect and unburdened title and right of possession. At the same time, the Indians' right of occupancy has always been held to be sacred; something not to be taken from him except by his consent, and then upon such consideration as should be agreed upon.

It is true that in the third division of the agreed statement there is a stipulation that the territory embraced within the so-called Red Lake Indian reservation remained unceded Indian lands, up to the action had on March 4, 1890, unless its status was affected by certain matters named. Doubtless its status, if by that is meant simply the character of the title, was not affected by those matters. While its boundaries were indicated, while it was called the Red Lake Indian reservation, yet the acts referred to did not purport to change the rights of the Indians or the Government, neither did they in fact change them. The land remained on March 4, 1890, land the fee of which was in the United States, but subject to the Chippewa Indians' right of occupancy. No patent had ever been executed by the United States to the Indians in severalty or to the tribe at large. The mere calling of the tract a reservation instead of unceded Indian lands did not change the title. It was simply a convenient way of designating the tract.

Yet if it was necessary to determine the question we should have little doubt that this was a reservation within the accepted meaning of the term. Prior to the treaty of October 2, 1863, the boundaries of the lands occupied by the Chippewa Indians had been defined by sundry treaties, and by that treaty a large portion of the lands thus occupied were ceded by the Indians; that is, the Indians ceded to the United States all their interest and right of possession. While there was no formal action in respect to the remaining tract, the effect was to leave the Indians in a distinct tract reserved for their occupation, and in the same act this tract was spoken of as a reservation. Now,

in order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation. *Spalding* v. *Chandler,* 160 U. S. 394, is in point. There, as here, was presented the question of the origin of a reservation, and in respect thereto it was said (pp. 403, 404):

" It is not necessary to determine how the reservation of the particular tract, subsequently known as the ' Indian reserve,' came to be made. It is clearly inferable from the evidence contained in the record that at the time of the making of the treaty of June 16, 1820, the Chippewa tribe of Indians were in the actual occupation and use of this Indian reserve as an encampment for the pursuit of fishing. . . . . But whether the Indians simply continued to encamp where they had been accustomed to prior to making the treaty of 1820, whether a selection of the tract, afterwards known as the Indian reserve, was made by the Indians subsequent to the making of the treaty and acquiesced in by the United States Government, or whether the selection was made by the Government and acquiesced in by the Indians, is immaterial. . . . If the reservation was free from objection by the Government, it was as effectual as though the particular tract to be used was specifically designated by boundaries in the treaty itself. The reservation thus created stood precisely in the same category as other Indian reservations, whether established for general or limited uses, and whether made by the direct authority of Congress in the ratification of a treaty or indirectly through the medium of a duly authorized executive officer."

Turning to the legislation of Congress in respect to school lands in Minnesota, the clause in the act establishing the territorial government has only this significance. It provided that when the lands in the Territory should be surveyed sections Nos. 16 and 36 " shall be and the same are hereby reserved," for the purpose of being applied to schools. But the agreed statement shows that these lands were not surveyed until after

the act of January 14, 1889, and the agreement with the Indians made in pursuance thereof, and approved by the President, March 4, 1900. Further, the State had been admitted into the Union, and the rights of the State are to be determined by the act of admission rather than by any prior declaration by Congress of its purpose in respect to certain lands. The act of admission provided:

" That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections or any part thereof has been sold or otherwise been disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools."

It will be perceived that this grant was of " public lands." It was held in *Newhall* v. *Sanger*, 92 U. S. 761, 763, that—

" The words ' public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."

In *Leavenworth &c. Railroad Co.* v. *United States*, 92 U. S. 733, 741, speaking of a grant to the State of Kansas in aid of the construction of a railway, as affecting lands within an Indian reservation, it was said:

" But did Congress intend that it should reach these lands? Its general terms neither include nor exclude them. Every alternate section designated by odd numbers, within certain defined limits, is granted; but-only the public lands owned absolutely by the United States are subject to survey and-division into sections, and to them alone this grant is applicable. It embraces such as could be sold and enjoyed, and not those which the Indians, pursuant to treaty stipulations, were left free to occupy."

In *Missouri, Kansas & Texas Railway Co.* v. *Roberts*, 152 U. S. 114, 119, are these words, referring to the reservation of sections 16 and 36 to Kansas as school lands:

" If the reservation named was intended as a grant of the sections sixteen (16) and thirty-six (36) to the Territory and to the States to be created out of them, or as a dedication of them for schools, it could only apply to such lands as were public

lands, for no other lands in our land system are subdivided into sections, nor could it embrace lands which had been set apart and reserved by statute or treaty with them for the use of the Indians, as was the case with the lands involved in this controversy, as we have already shown."

See also *Doolan* v. *Carr*, 125 U. S. 618, 632; *Bardon* v. *Northern Pacific Railroad Co.*, 145 U. S. 535, 538; *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 284; *Barker* v. *Harvey*, 181 U. S. 481, 490.

Again, the language of the section does not imply a grant *in præsenti*. It is " *shall* be granted." Doubtless under that promise whenever lands became public lands they came within the scope of the grant. As said in *Beecher* v. *Wetherby*, 95 U. S. 517, 523, with reference to a similar clause in the act for the admission of Wisconsin into the Union:

" It was, therefore, an unalterable condition of the admission, obligatory upon the United States, that section sixteen (16) in every township of the public lands in the State, which had not been sold or otherwise disposed of, should be granted to the State for the use of schools. It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the State upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the State. They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted."

And again, in *United States* v. *Thomas*, 151 U. S. 577, 583:

" Mr. Justice Lamar, while Secretary of the Interior, had frequent occasion to consider the nature and effect of the grant of school lands, where the title was at all encumbered or doubtful; and on this subject he said (6 L. Dec. 418) that the true theory was this: ' That where the fee is in the United States at the date of survey, and the land is so encumbered that full and complete title and right of possession cannot then vest in

the State, the State may, if it so desires, elect to take equivalent lands in fulfillment of the compact, or it may wait until the right and title of possession unite in the Government, and then satisfy its grant by taking the lands specifically granted.' And this view he considered 'as fully sustained by the decisions of the courts and the opinions of the Attorneys General,' and cited in support of it *Cooper* v. *Roberts*, 18 How. 173; 3 Opins. 56; 8 Opins. 255; 9 Opins. 346; 16 Opins. 430; *Ham* v. *Missouri*, 18 How. 126."

So also in *Cooper* v. *Roberts*, 18 How. 173, 179, the question presented was whether certain mineral lands were excepted from the grant of school lands to the State. The words of the school land grant were, as here, "shall be granted," and it was said:

"We agree, that until the survey of the township and the designation of the specific section, the right of the State rests in compact—binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty, the compact has an object, upon which it can attach, and if there is no legal impediment the title of the State becomes a legal title. The *jus ad rem* by the performance of that executive act becomes a *jus in re*, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others. *Gaines* v. *Nicholson*, 9 How. 356."

But while this is true it is also true that Congress does not, by the section making the school land grant, either in letter or spirit, bind itself to remove all burdens which may rest upon lands belonging to the Government within the State, or to transform all from their existing status to that of public lands, strictly so called, in order that the school grant may operate upon the sections named. It is, of course, to be presumed that Congress will act in good faith; that it will not attempt to impair the scope of the school grant; that it intends that the State shall receive the particular sections or their equivalent in aid of its public school system. But considerations may arise which will

justify an appropriation of a body of lands within the State to other purposes, and if those lands have never become public lands the power of Congress to deal with them is not restricted by the school grant, and the State must seek relief in the clause which gives it equivalent sections. If, for instance, Congress in its judgment believes that within the limits of an Indian reservation or unceded Indian country—that is, within a tract which is not strictly public lands—certain lands should be set apart for a public park, or as a reservation for military purposes, or for any other public uses, it has the power notwithstanding the provisions of the school grant section. So it is that when Congress came in 1889 to make provision for this body of lands it could have by treaty taken simply a cession of the Indian rights of occupancy, and thereupon the lands would have become public lands and within the scope of the school grant. But it also had the power to make arrangements with the Indians by the which the entire tract would be otherwise appropriated.

What was in fact done? The act of January 14, 1889, provided for a commission to negotiate for the cession and relinquishment of "all and so much of" the White Earth and Red Lake reservations as in the judgment of the commission should not be required to satisfy the allotments required by the existing acts, the cession to be "for the purposes and upon the terms hereinafter stated." The allotments referred to were allotments in severalty, made in conformity to the provisions of the act of February 8, 1887. 24 Stat. 388. The ceded lands were to be divided into two classes; one appraised and sold at auction and the other disposed of to actual settlers at $1.25 per acre. The proceeds of these sales were to be placed in the Treasury of the United States as a permanent fund to the credit of the Indians, drawing interest at five per centum for fifty years, the interest to be expended, three fourths paid in cash to the Indians severally and the remaining one fourth devoted, under the direction of the Secretary of the Interior, "exclusively to the establishment and maintenance of a system of free schools among said Indians in their midst and for their benefit." The cession was not to the United States absolutely,

but in trust.   It was a cession of all of the unallotted lands. The trust was to be executed by the sale of the ceded lands and a deposit of the proceeds in the Treasury of the United States to the credit of the Indians, such sum to draw interest at five per cent, and one fourth of the interest to be devoted exclusively to the maintenance of free schools among the Indians and for their benefit.

Now it is contended that this legislation, though dealing with, in terms, all the unallotted lands, is subordinated to the prior promise of the Government to grant sections 16 and 36 to the State for school purposes.   In other words, the cession and relinquishment by the Indians, it is said, extend to all the unallotted lands, but that cession and relinquishment having been accomplished, the trust which by the same legislation is created in respect to the same lands is limited, and restricted by the prior promise of the Government, and this notwithstanding the fact that the Government had provided that the State might take other lands, in case any particular sections 16 and 36 had become appropriated to other public uses.   We are not disposed to belittle this contention.   The arguments in favor of it, both those founded on technical rules of statutory construction and those based upon the long-established policies of the Government in respect to both the Indians and the public schools, are presented by counsel for the State with exceeding force and ability. Notwithstanding this, we are constrained to believe that not only the technical rules of statutory construction, but also the general scope of the legislation in these matters, and the policy of the United States in respect to public schools, and also to Indians, as the wards of Government, concur in sustaining the contention of the Government that none of these ceded lands passed under the school grant to the State.

And first, in reference to technical rules of statutory construction.   The cession was, as we have seen, of all the unallotted lands, and the cession was of those lands " for the purposes and upon the terms hereinafter stated."   It was a distinct conveyance by the Indians of certain lands for a named purpose. Now if the United States, the recipient of this cession, was competent to carry into execution the expressed purposes, does

it not follow that the cession subjected all the lands to them? Can it be said that the Indians, making the cession, for a moment supposed that the lands ceded were not to be used for the purposes named, and if the language carries upon its face one obvious meaning, and would naturally be so understood by the Indians, that construction within all the rules respecting Indian treaties must be enforced. As said in *Worcester* v. *Georgia*, 6 Pet. 515, 582 :

" The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. To contend that the word 'allotted,' in reference to the land guaranteed to the Indians in certain treaties, indicates a favor conferred rather than a right acknowledged, would, it would seem to me, do injustice to the understanding of the parties. How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."

And in *Choctaw Nation* v. *United States*, 119 U. S. 1, 28 :

" The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons equally subject to the same laws."

But reliance is placed upon the doctrine that a later general statute does not repeal by implication a prior special statute unless there is an absolute incompatibility between the two,

and the earlier will remain as an exception to the later. It is said that here the earlier statute was a special grant or promise to grant two particular sections in each township; the later a general statute in respect to all of a large body of lands. There is no necessary incompatibility between the two, and the earlier should be taken as an exception to the later and the later held applicable to all the lands except the specially named sections. *Beecher* v. *Whetherby, supra,* is referred to as an illustration of the doctrine and in point in reference to school lands. But in that case the cession from the Indians was not subject to any trust. The facts were these: The action was replevin to recover logs cut upon a particular section, and the title to the logs depended on the title to the land. The Wisconsin school grant, in 1846, though of only section 16, was in form similar to that to Minnesota, and the defendant claimed under that grant. A treaty had been concluded with the Menomonees, February 8, 1831, containing a provision that two specified townships should be set apart for the use of the Stockbridge and Munsee Indians. In these townships was the section 16 in controversy. By treaty, ratified January 23, 1849, the Menomonees, in consideration of the sum of $350,000 and a reservation west of the Mississippi, agreed to cede all their lands in Wisconsin. The eighth article of the treaty stipulated that they should be permitted to remain on the ceded lands for two years and until notified by the President that the lands were wanted. By treaty of May 12, 1854, this proposed reservation west of the Mississippi River was retroceded by the Indians to the United States, and in consideration of such cession the United States agreed to give them a home, "to be held as Indian lands are held," upon Wolf River, in Wisconsin, which tract included the townships set apart for the benefit of the Stockbridge and Munsee Indians. On February 6, 1871, Congress passed an act for the sale of these two townships, except eighteen contiguous sections thereof, and the appropriation of the proceeds for the benefit of the Stockbridge and Munsee Indians, and in pursuance of that act the United States sold the land in controversy to the plaintiff. The court held that the title of the defendant under the school grant was superior to that of the plaintiff under the

sale by the United States. Two facts are apparent: First, the Menomonee Indians in the first instance received a cash and real estate consideration for the large reservation which they conveyed to the United States; second, that while thereafter a tract was ceded to them to be held as Indian lands are held —a tract which included the section in controversy—and while by an earlier treaty with the Menomonees two townships of such tract (including this particular section 16) had been set apart for the use and benefit of the Stockbridge and Munsee Indians, yet there appears no treaty or agreement with either the Menomonee or Stockbridge or Munsee Indians in reference to the sale of these two townships. Yet, as stated by the court, "when the logs in suit were cut, those tribes had removed from the land in controversy, and other sections had been set apart for their occupation." The ruling was that the United States held the fee, subject only to the Indian right of occupancy; that by the school land section in the enabling act there was a grant, or promise to grant,—in either event to be taken as an appropriation of the fee to the State, subject to the Indian right of occupancy; that the Indians had removed from the lands and had received other lands for their occupation; that hence all Indian rights had ceased. The court, quoting in its opinion from *United States* v. *Cook*, 19 Wall. 591, said (p. 593): "The right of the Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy. The possession, when abandoned by the Indians attaches itself to the fee without further grant."

Hence, applying the doctrine in respect to earlier special and later general statutes, the Government having received from the Indians their right of occupancy, without any stipulation or agreement or trust in respect thereto, it was held that the act providing for the sale of the two townships could not have been intended to authorize a sale of specific sections therein which had been already conveyed or promised to the State. But this case stands on entirely different grounds. Before any survey of the lands, before the state right had attached to any particular sections, the United States made a treaty or agreement with the Indians, by which they accepted a cession of the

entire tract under a trust for its disposition in a particular way. The question is not as to the construction of two separate statutes, but as to the scope and effect to be given to a treaty or agreement with the Indians, and whether it is to be narrowed in its scope by any rules applicable to the construction of statutes—rules with which it is not to be supposed the Indians were familiar.

*Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, is also referred to. In that case the controversy was in respect to a tract of land within the place limits of the grant to the Northern Pacific Railroad Company, 13 Stat. 365, and which at the time of the filing of the map of definite location was within the limits of an Indian reservation By the second section of the granting act it was provided that "the United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian titles to all lands falling under the operation of this act, and acquired in the donation to the (road) named in this bill." In 1872 the United States entered into a treaty with the Indians, by which for a cash consideration so much of the reservation as covered the land in controversy was ceded to the United States. It was held that by the original act the fee which was in the United States passed to the railroad company, subject to the Indian right of occupancy, which was afterwards, in pursuance of the promise to the company in the granting act, extinguished for a cash consideration, and immediately there was vested in the company a title paramount to that of one attempting a preemption. Here then, as in the prior case, the cession by the Indians was subject to no trust or condition, and the question was simply as to the effect to be given to various statutes.

*Heydenfeldt* v. *Daney Gold & Silver Mining Company*, 93 U. S. 634, while not involving any question of Indian rights, is worthy of notice, as affecting a State's claim to school lands. The Nevada enabling act, approved March 21, 1864, 13 Stat. 30, 32, contained this provision: "That sections numbered sixteen and thirty-six in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto, in legal subdivisions of not less

than one quarter section, and as contiguous as may be, shall be, and are hereby, granted to said State for the support of common schools." The plaintiff claimed title by conveyance from the State of a part of a section sixteen. The defendant rested upon a mineral patent from the United States, his entry upon the lands having been prior to any survey, and in conformity to the miners' laws, customs and usages of the district. Although the terms of the school land section were terms of present grant, and although the entry by the defendant was after the State had been admitted, yet his title was adjudged superior to that obtained from the State, the court holding that the United States had full power to dispose of the land until after a survey and the identification thereby.

Again, it is well to bear in mind the joint resolution passed by Congress on March 3, 1857, a resolution which was prompted by a memorial from the legislature of the Territory of Minnesota, and which, recognizing the possibility of settlements or townsite entries before the public surveys on lands which by such surveys were afterwards found to be school sections, provided that when any such sections should be occupied by settlers or selected as townsites " or reserved for public uses before the survey," then other lands might be selected in lieu thereof. That the sale of the ceded lands for the purpose of creating a fund for the benefit of the Indians was a use of them for a public purpose, cannot be doubted. But the contention of counsel for the State is " that the public uses which were intended to operate as an appropriation prior to the services were uses to which the land itself might be put or employed for governmental uses." It is unnecessary to rest upon a determination of this question. We refer to the resolution as an express declaration by Congress that the school sections were not granted to the State absolutely and beyond any further control by Congress, or any further action under the general land laws. As in *Heydenfeldt* v. *Daney Gold & Silver Mining Co., supra,* priority was given to a mining entry over the State's school right, so here, in terms, preference is given to private entries, townsite entries, or reservations for public uses. In other words, the act of admission with its clause in respect to school

lands was not a promise by Congress that under all circumstances, either then or in the future, these specific school sections were or should become the property of the State.   The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for a selection of other lands in lieu thereof.   In this connection may also be noticed the act of February 28, 1891, although passed after the approval of the agreement for the cession of these lands by the Indians.   That act in terms authorized the selection of other lands " where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States."

We come finally to a consideration of the policy of the Government both in respect to schools and to Indians.   It is undoubtedly true that such policy from the beginning has been liberal in the appropriation of lands for school purposes.   See a review of the legislation in respect thereto in the opinion in *Cooper* v. *Roberts, supra.*

It is not to be supposed that Congress intended any departure from this policy in its legislation in respect to lands within Minnesota, and the courts are justified in any fair construction of such legislation as will secure to the State its full quota of lands for aid in the development of its public school system.   It is also true that much of the legislation in respect to Indians and many of the treaties with them have contemplated simply the cession of their lands and their removal to tracts further west. In such cases, where there has been simply a cession by the Indian tribe of its reservation and a removal to some new territory, it is not strange that the school grants have been generally held operative in the ceded reservations.   The interests of public schools have always been considered paramount to those of railroad companies in grants made to aid in their construction. The one speaks for intellectual; the other for material development.   Of course, when the Indian tribe has been removed by treaty from one body of land to another the interest of the tribe in the land from which it has been removed ceases and the full obligation of the Government to the Indians is satisfied when the pecuniary or real estate consideration for the cession is se-

cured to them. But in some instances, and this is one of them, the Indians have not been removed from one reservation to another, but the Government has proceeded upon the theory that the time has come when efforts shall be made to civilize and fit them for citizenship. Allotments are made in severalty, and something attempted more than provision for the material wants of the Indians. In construing provisions designed for their education and civilization as fully if not more than in construing provisions for their material wants, is it a duty to secure to the Indians all that by any fair construction of treaty or statute can be held to have been understood by them or intended by Congress. Instead of removing these Chippewa Indians from Minnesota, the purpose of the legislation and agreement was to fit them for citizenship by allotting them lands in severalty and providing a system of public schools. Surely it could not have been understood by the Indians that only part of the lands they ceded were to be used for these purposes. They were dealing with the tract as an entirety, and they had a right to expect that the entire tract would be used as declared in the act and agreement. No provision is made for compensating the Indians for lands which would be lost if the right of the State was sustained, whereas, on the other hand, the right of the State to compensation for the particular school sections within the tract had already been secured. Contrasting the two policies—that in respect to public schools and that in respect to the care of the Indians—it would seem that we are called upon to uphold the rights of the Indians, which otherwise would be wholly lost without compensation as against the claims of the State for which satisfaction in other directions has been provided.

For these reasons we are of opinion that the claim of Minnesota to these lands cannot be sustained, and a decree will be entered in favor of the defendants dismissing the bill.

MR. JUSTICE GRAY did not hear the argument, and took no part in the decision of this case.