PUBLIC SERVICE COMMISSIONERS *vs.* NEW ENGLAND TELEPHONE
AND TELEGRAPH COMPANY.

Suffolk.   February 27, 1919. — March 22, 1919.

Present: RUGG, C. J., LORING, BRALEY, CROSBY, & PIERCE, JJ.

*Equity Pleading and Practice,* Hearing on bill and answer.   *Jurisdiction.   Public
Service Commission.   Telephones and Telegraphs.   United States.   Statute,*
Construction.

When a suit in equity is set down to be heard upon the bill and answer, alle-
gations in the answer which are in conflict with those in the bill must be
taken to be true, and the allegations of the bill are to be taken as true only so
far as they are admitted or are not'at variance with facts well pleaded in the
answer.

The public service commissioners cannot maintain a bill in equity under St. 1913,
c. 784, § 28, against a telephone corporation to enforce by a mandatory injunc-
tion an order of the public service commission relating to toll telephone rates
within this Commonwealth, while the telephones and property of the corpora-
tion are in the possession and control of the United States under a procla-
mation of the President and a bulletin of the Postmaster General made by
authority of the war power granted by the resolution of Congress of July
16, 1918.

Consent of the United States to be made a party to a proceeding in a State court
cannot be inferred from a remote and equivocal phrase in a resolution of Con-
gress having direct and adequate reference to another matter.

BILL IN EQUITY, filed in the Supreme Judicial Court on Feb-
ruary 1, 1919, under St. 1913, c. 784, § 28, by the public service
commissioners against the New England Telephone and Tele-
graph Company, to enforce by a mandatory injunction an order
of the public service commission of January 20, 1919, in regard to
toll telephone rates within the Commonwealth and a further
order of January 31, requiring the defendant to cancel the rates
and charges stated in certain proposed schedules.

The answer of the defendant set forth the matters which are
stated in the opinion.

The case came on to be heard by *De Courcy,* J., who at the
request of the parties reserved it for determination by the full
court upon the bill and the answer.

*W. H. Hitchcock*, Assistant Attorney General, for the plaintiffs.

*J. N. Clark*, for the defendant.

*C. M. Bracelin* (of New York), for the Postmaster General, addressed the court.

*T. J. Boynton*, United States District Attorney, also addressed the court.

Rugg, C. J.  This is a bill in equity brought under St. 1913, c. 784, § 28, to enforce by injunction an order of the public service commission dated January 20, 1919, relative to toll telephone rates within the Commonwealth.  The case comes before us by reservation for determination upon the bill and answer.  The case must be considered upon the footing that the averments of the answer are true where in conflict with those of the bill and that the allegations of the bill are true only so far as admitted or not at variance with facts well pleaded in the answer.  *Perkins* v. *Nichols*, 11 Allen, 542.  *American Carpet Lining Co.* v. *Chipman*, 146 Mass. 385.

The pertinent facts thus ascertained are that before July 31, 1918, the defendant was a corporation operating within the Commonwealth an extensive system for the transmission of intelligence by telephone.  On July 16, 1918, during the continuance of the great war the Congress of the United States in the exercise of its war powers passed a resolution empowering the President during the war "to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war."  The President exercised the power thus conferred by his proclamation of July 22, 1918.  Its relevant provisions were that "I . . . do hereby take possession and assume control and supervision of each and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever and all materials and supplies.  It is hereby directed that the supervision, possession, control, and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the Postmaster General, Albert S. Burleson.  Said Postmaster General may perform the duties hereby and hereunder imposed upon him, so long and to such

extent and in such manner as he shall determine, through the owners, managers, boards of directors, receivers, officers, and employees of said telegraph and telephone systems. Until and except so far as said Postmaster General shall from time to time by general or special orders otherwise provide, the owners, managers, boards of directors, receivers, officers and employees of the various telegraph and telephone systems shall continue the operation thereof in the usual and ordinary course of the business of said systems, in the names of their respective companies, associations, organizations, owners, or managers, as the case may be. . . . From and after 12 o'clock midnight on the 31st day of July, 1918, all telegraph and telephone systems included in this order and proclamation shall conclusively be deemed within the possession and control and under the supervision of said Postmaster General without further act or notice." On August 1, 1918, the Postmaster General issued a bulletin wherein he declared: "Pursuant to the proclamation of the President of the United States, I have assumed possession, control and supervision of the telegraph and telephone systems of the United States. . . . Until further notice the telegraph and telephone companies shall continue operation in the ordinary course of business through regular channels. Regular dividends heretofore declared and maturing interest on bonds, debentures and other obligations may be paid in due course, and the companies may renew or extend their maturing obligations unless otherwise ordered by the Postmaster General. All officers, operators and employees of telegraph and telephone companies will continue in the performance of their present duties, reporting to the same officers as heretofore and on the same terms of employment." The proclamation of the President and the bulletin of the Postmaster General have been put into effect and operation according to their terms and are still in force unrevoked and unmodified. The answer avers further that pursuant to this proclamation and bulletin the entire telephone system of the defendant including all its equipment, appurtenances, material, supplies and property of every description has been taken possession of by the government of the United States and is vested in the President and is controlled and operated exclusively by him, and that in consequence thereof the defendant has been divested of all its tele-

phone system and all its property of every kind thereto appertaining and of all power, management and control over the same and retains only the legal title thereto.   Just compensation for the supervision, possession, control and operation by the government of the United States of the defendant's telephone system in an amount satisfactory to it has been determined upon and awarded to and accepted by it, and an agreement has been entered into whereby the entire compensation to be received by it from July 31, 1918, to the end of the period of governmental control has been fixed and the amount of such compensation is not in any respect dependent upon the financial result of the operation of its system by the United States government and the defendant has no pecuniary interest in the profits or losses resulting from such operation.   The resolution of Congress of July 16, 1918, conferred ample power upon the President to determine the amount of just compensation to be paid to the owner for such possession, supervision, control and operation.

The defendant has pleaded that the United States, the President, the Postmaster General or some one or more of them, are necessary parties to this proceeding, and further that the proceeding is in substance against the United States and that the relief prayed for, which relates exclusively to toll rates for intrastate telephone service, will in effect restrain the United States in its control, possession and operation of the telephone system belonging to the defendant and formerly operated by it; and that it has not been since July 31, 1918, a common carrier or otherwise furnishing as a corporation any service for public use so as to be subject to the jurisdiction of the public service commission under St. 1913, c. 784.

It is conceded by both parties hereto that the resolution of Congress of July 16, 1918, was a constitutional exercise of the war powers of the federal government and that the proclamation of the President and the bulletin of the Postmaster General have been pursuant thereto and are operative according to their terms.

. The order of the public service commission here sought to be enforced purported to suspend the taking effect of substantial increases in the rates of toll charges to users of the telephone between places within the Commonwealth, in accordance with a

"basic toll rate schedule" issued by an order of the Postmaster General of the United States.

It seems manifest from this narration of facts and recital of official documents that the United States is vitally interested and is alone concerned in the toll rates to be collected for telephone service over the system belonging to the defendant. The resolution of Congress of July 16, 1918, is most comprehensive in scope. It authorized the President to take full, complete, absolute and unqualified possession of the defendant's system. It seems to us that the proclamation of the President according to its true construction was co-extensive in its sweep with the power conferred by the resolution. By express words the President took possession and assumed control of every part of each and every telephone system including all equipment and appurtenances and all materials and supplies. It would be difficult to employ words of broader reach or wider embrace than those in which the proclamation is couched. The phrase of the bulletin of the Postmaster General is equally comprehensive in its grasp. The effect of these documents was not a mere public supervision of an operation by private owners. It was a complete assumption of entire possession and unqualified control to the exclusion of every private interest. No distinction is made by their terms between interstate service and intrastate service. Both alike are taken into the possession of the United States. Powers so extensive as were thus assumed can be exercised only through various governmental agencies. But the right and power of the government are paramount and admit of no associates. In execution of the authority conferred by the resolution of July 16, 1918, just compensation for that which has been taken from the defendant has been awarded by the President and accepted by the defendant. Its interest has come to an end as to the matter of charges to be exacted for the service rendered by the United States for the use of the property of the defendant. The government has utterly supplanted the defendant in this field. The matter of rates is now the sole financial affair of the United States.

The reasonableness and amount of the rates to be charged for intrastate toll telephone service are of direct concern to the United States. As was said in *Wells* v. *Roper*, 246 U. S. 335, at

page 337, "That the interests of the Government are so directly involved as to make the United States a necessary party and therefore to be considered as in effect a party, although not named in the bill, is entirely plain." In *Louisiana* v. *McAdoo*, 234 U. S. 627, at page 629, are found these words: "That the United States is not named on the record as a party is true. But the question whether it is in legal effect a party to the controversy is not always determined by the fact that it is not named as a party on the record, but by the effect of the judgment or decree which can here be rendered. *Minnesota* v. *Hitchcock*, 185 U. S. 373, 387." These statements but summarize the effect of earlier and exhaustive discussions of the principles applicable to states of facts so similar to those presented in the case at bar as to be indistinguishable. *Belknap* v. *Schild*, 161 U. S. 10, and cases there reviewed by Mr. Justice Gray. *Louisiana* v. *Garfield*, 211 U. S. 70, 77. *Oregon* v. *Hitchcock*, 202 U. S. 60. *Naganab* v. *Hitchcock*, 202 U. S. 473. The circumstance that the United States is not the owner of the system of the defendant but only lawfully in possession of it with the right to collect reasonable tolls is immaterial in this connection. "It has a property, a right *in rem*, . . . which, though less extensive than absolute ownership, has the same incident of a right to use." *International Postal Supply Co.* v. *Bruce*, 194 U. S. 601, 606.

We think the case at bar is distinguishable from *Kaufman* v. *Lee*, 106 U. S. 196, *Tindal* v. *Wesley*, 167 U. S. 204, *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, and similar cases where relief was granted against officers of the United States acting outside of their authority. There is nothing on this record to indicate that the defendant, if and so far as it is an agency of the federal government, upon which we express no opinion, is exceeding the limits of power conferred by the resolution, proclamation and bulletin.

It is a fundamental principle of law that "The United States . . . , like all sovereigns, cannot be impleaded in a judicial tribunal, except so far as they have consented to be sued." *Belknap* v. *Schild*, 161 U. S. 10, 16. *McArthur Brothers Co.* v. *Commonwealth*, 197 Mass. 137. We are aware of no statute whereby the United States has consented either to become a party to rate fixing proceedings before the public service commission or before

this court under St. 1913, c. 784. No such statute has been called to our attention.

It is the contention of the Attorney General in behalf of the public service commissioners that the resolution of Congress of July 16, 1918, reserved to the States the right to regulate in-intrastate rates to the same extent as that power existed before federal control. That contention is founded upon the final clause of the resolution, which is in these words: "Provided further, That nothing in this Act shall be construed to amend, repeal, impair, or affect existing laws or powers of the States in relation to taxation or the lawful police regulations of the several States, except wherein such laws, powers, or regulations may affect the transmission of Government communications, or the issue of stocks and bonds by such system or systems." That proviso does not seem to us reasonably susceptible of being stretched by implication to include a consent to be impleaded in the State courts in such a proceeding as this. Such consent is not commonly inferable from such a remote and equivocal phrase having direct and adequate reference to another matter. *Troy & Greenfield Railroad* v. *Commonwealth*, 127 Mass. 43. Therefore it appears to us unnecessary to consider or discuss the merits of the question whether the proviso of the resolution of July 16, 1918, under its reservation of "lawful police regulations of the several States" "justifies rate regulation by a State in the exercise of its police power," *Union Dry Goods Co.* v. *Georgia Public Service Corp.* 248 U. S. 372, 375, because we do not reach it. As was said by Mr. Justice Holmes in *Goldberg* v. *Daniels*, 231 U. S. 218, 221, 222, "there is another that comes earlier in point of logic. The United States is . . . in possession. . . . It cannot be interfered with behind its back, and, as it cannot be made a party, this suit must fail."

*Petition dismissed.*