THE FAJARDO SUGAR GROWERS ASSOCIATION, ETC., Plaintiff and Appellant, v. WILLIAM P. KRAMER, ETC., ET AL., Defendants and Appellees.

No. 4531. Argued May 10, 1932.—Decided July 14, 1933.

338

Jaime Sifre, Jr., Diego O. Marrero, and H. Franceschi for appellant. Charles E. Winter, Attorney General, A. Ortiz Toro, Assistant Attorney General (James R. Beverley on the brief) for appellees Kramer and Flores. Arturo Aponte for appellee González.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

This is a suit for injunction brought by the Fajardo Sugar Growers Association, an unincorporated company, organized under the laws of the State of New York, and having a principal office located at Fajardo, Puerto Rico, against William P. Kramer and Valeriano Flores, respectively chief and forest ranger of the Insular Forest Service, and Antonio González, a resident of Naguabo, Puerto Rico.

The complaint alleges:

That the plaintiff is the owner of a property known as "La Esperanza," situated in the ward of Daguao in the municipal district of Naguabo, and consisting of two parcels: one, A, of 450 acres (cuerdas), bounded on the west by the Quebrada Palmas River; and another, B, of 459 acres, also bounded on the west by the Quebrada Palmas River, and on the south by land of Mr. Pablo Sandoz, and by the sea; that the plaintiff acquired said parcels in 1909, the corresponding titles being recorded in the registry of property, and has ever since held possession thereof, within their boundaries, free from any limitation whatsoever.

That the defendants, Kramer and Flores, acting by themselves and through their agents have, prior to the filing of the complaint, forcibly entered, and are now threatening

to continue to so enter, upon the property "La Esperanza," especially upon parcel B, and have cut timber and firewood and authorized other persons to do so, without right or title thereto; and that the other defendant, González, now keeps on said property a number of workmen cutting firewood and committing other acts of trespass.

That the forcible intervention of Kramer with plaintiff's property is not confined to the above mentioned acts, but also includes the invasion of plaintiff's right to the free use and enjoyment of its property; and that on several occasions he had filed criminal complaints against the employees of the plaintiff because they have entered upon said property in order to do necessary work and to perform acts of ownership.

On the same day that the complaint herein was filed, the plaintiff moved for "a preliminary injunction, a restraining order, and a rule to show cause." Upon the filing of a bond in the sum of $1,000, the defendants were ordered to refrain from entering the property of the plaintiff, and from disturbing the latter in the free use and enjoyment thereof, and to show cause why the preliminary writ of injunction sought should not be issued.

The defendants, Kramer and Flores, represented by the Attorney General of Puerto Rico, answered the rule to show cause and the complaint, and alleged, in short, that the plaintiff is the true owner of "La Esperanza", with the exception of a small parcel of swamp land (*manglares*) owned by the People of Puerto Rico, and included within the description of lot B, as set forth in the complaint, the boundaries of said swamp land being as follows:

" 'A parcel of swamp land (*manglares*) situated in the ward of 'Daguao', of Humacao, comprising 91.77 acres (*cuerdas*); bounded on the north by land pertaining to the Esperanza Estate; on the south by the sea; on the east by land of Francisco Meléndez; and on the west by Quebrada Palmas."

The defendants admitted that plaintiff's property is recorded in the registry, but they alleged that from the reg-

istry itself it appears that it was formed by consolidating several tracts, one of which was the swamp land above described, which was acquired by Guillermo Noble, plaintiff's original predecessor in interest, by a royal grant subject to certain conditions of cultivation which were not complied with, and thereupon the property reverted to the Kingdom of Spain, and subsequently passed to the People of Puerto Rico, which is in the possession and enjoyment thereof as a part of the Forest Reserve of the Island.

They denied that plaintiff is in possession of the whole of lot B, or that it held possession thereof prior to the filing of the complaint; and also denied having entered on any part of lot A, but admitted that they entered on that part of lot B comprised within the land belonging to the People of Puerto Rico and described above. They further denied specifically the remaining averments of the complaint.

As new matter they alleged:

"1.—That the People of Puerto Rico is the owner of the following property:

"A parcel of swamp land (*manglares*) situated in the ward of "Daguao," municipal district of Naguabo, containing 69 hectares, 24 acres, 99 centiares, equivalent to 176.19 acres, bounded on the north by land pertaining to the Esperanza Estate owned by the Fajardo Sugar Company; on the south by the sea; on the east by the said land of the Esperanza Estate and other land of the Succession of Juan Cruz; and on the west by land belonging to Behn Bros., and separated therefrom by Quebrada Palmas.

"The above property was formed by consolidating the parcel first above described in this answer with the remaining mangrove swamps located in the same district, and both parcels thus constituted are designated or known indistinctly as 'Oriente' and 'Esperanza.'

"2.—That the parcel described at the beginning of this answer, which was consolidated with other tracts to form the property described under the letter B in the third paragraph of the complaint, was granted by the Spanish Government to Mr. Guillermo Noble y Látimer in the year 1869, upon the condition that said grantee, within the period of one year, counted from that date, should have under cultivation one-tenth of said parcel; within four years, one-fourth thereof; and within ten years, one-half; and that said grantee failed

to comply with said condition and for that reason the title reverted to the Spanish Crown. In the year 1879, Mr. César de Guillerna, Forest Engineer of the Kingdom, took possession of said property in the name of the Crown, and ever since that time the Government has been in continuous possession thereof.

"3.—That the plaintiff, at all times and especially since the year 1919 until recently, has acknowledged that the People of Puerto Rico is the absolute owner of the parcel last above described, lately known indistinctly by the names of 'Oriente' and 'Esperanza', and has led everyone to believe in the existence of such state of fact; and that the plaintiff and the defendants have acted upon that belief."

As special defenses they set up:

"1.—That the real party in interest in this case is the People of Puerto Rico, and it has not consented in any way to be sued.

"2.—That the acts of the defendants Kramer and Flores are within the authority conferred upon them by law, and are being performed wthin the functions of their respective offices as Chief of the Forest Service, and forest ranger, and the other defendants, Antonio González, is a mere purchaser of firewood and timber grown on the parcel last above described, for which products the said Mr. González has paid and still pays to the People of Puerto Rico the price fixed by the Government as the value of those products.

"3.—That this court lacks jurisdiction to decree an injunction in this case because the plaintiff has never caused to be settled by an adjudication of a court of law the conflict in the titles existing since the land, originally granted to Mr. Guillermo Noble, plaintiff's predecessor in interest, reverted to the Government.

"4.—That the plaintiff has not been diligent in the exercise of its rights, allowing the People of Puerto Rico from time immemorial to possess and enjoy that parcel, and to incur great expense in the survey, scientific cultivation, conservation, and exploitation of said property of the People of Puerto Rico, and in maintaining several employees and public officials to watch daily over said land.

"5.—That the occupancy and enjoyment by the People of Puerto Rico of the property last above described does not cause any prejudice to the plaintiff."

The other defendant, González, answered separately as follows:

"1.—With respect to the sixth paragraph of the complaint, the defendant denies having committed any acts concerning any of the

properties described in the complaint nor any acts prejudicial to the plaintiff.

"2.—As a special and separate ground of defense, this defendant alleges that during the last four years he has been partially engaged in the purchase of firewood and timber grown on the mangrove swamps (*manglares*) belonging to the People of Puerto Rico, especially those pertaining to the Esperanza parcel, which, according to his information and belief, is a part of the property described under the letter B in the complaint. And the defendant alleges that all his acts have been performed pursuant to an agreement entered into with the People of Puerto Rico, through its officers and employees, and that all his activities in this connection have been carried out with the intervention and under the supervision of the Insular Government.

"3.—That the defendant has contracted for the purchase of 4,000 tons of firewood grown on the Esperanza property, to be delivered during the months of December and January, nineteen hundred and twenty-six and nineteen hundred and twenty-seven, respectively, and has previously obtained permission to that effect from the People of Puerto Rico. And the defendant alleges that he has been unable to perform this contract by reason of the pendency of the suit for injunction herein, and that at the present time he has his tracks abandoned and all his work is at a standstill, which causes him irreparable damage."

Considerable evidence, both oral and documentary, was introduced by the parties, and the district court finally refused to issue the preliminary injunction sought. In its opinion filed, it partially said:

"The allegations which we have briefly reviewed, as well as the evidence adduced, show the existence of a real conflict between the parties with respect to the ownership titles and also a controversy in regard to the fact of possession; and, in addition, the right of the plaintiff to bring its action is doubtful, not only because of its delay in bringing suit, but also because the People of Puerto Rico is an interested party. Under these circumstances, and as the court can not consider those questions in this preliminary proceeding, since to do so would be equivalent to deciding the controversy on the merits, we are of opinion that the peliminary injunction sought does not lie, especially in view of the doctrine laid down by our Supreme Court in *Boudens et al* v. *Körber et al.*, 18 P.R.R. 254, thus:

" 'Before closing this opinion we desire to state that the effect of a restraining order lasts only during the few days which generally intervene between the day it is issued and that on which the court hears the reasons given by defendant why a preliminary or a perpetual injunction should or should not be granted, as the case may be. Such restraining orders, however, should be issued with great caution, and it does not, therefore, seem proper that they should be granted where the acts sought to be restrained or prohibited were being performed during a considerable time prior thereto.'

"We think that the above doctrine is applicable to the case at bar, wherein by granting the preliminary injunction sought we would do nothing more than prolong the restraining order decreed until the final decision of the case on the merits.

"Therefore, the petition for a preliminary injunction must be denied, and the restraining order issued will be dissolved."

Feeling aggrieved by that decision, the plaintiff took the present appeal. It has assigned in its brief five errors, which it claims were committed by the district court (1) in holding that there exists a real conflict of ownership titles between the parties; (2) in declaring that the right of the plaintiff to the relief sought in this suit is doubtful; (3) in holding that because the People of Puerto Rico is an interested party, the preliminary injunction requested does not lie; (4) in declaring that it was not proper to consider the questions raised by the preliminary injunction because it would be tantamount to deciding the case on the merits; and (5) in failing to hold that the law and the facts were in favor of the plaintiff, and to grant the relief sought by the latter. We shall consider first the fourth assignment, and then the remaining ones jointly.

Really, the trial court went into the substance of the case and decided it on the merits. The appellant itself acknowledges this in its brief. In making the remarks that appear at the end of his opinion, the trial judge doubtless intended to limit the scope of his previous findings, by showing that his mind and his conscience were open to any subsequent adverse proof.

We agree that a court of original jurisdiction should proceed with great caution in cases of this character, but if the controverted question appears clearly from the pleadings and the evidence, it should be decided regardless of the effect that it might have on the final outcome of the litigation.

The situation having thus been cleared, we shall now proceed to consider the questions involved in the proceeding. The pleadings are complete, the evidence extensive, and the briefs filed before this court have been carefully prepared. We are not dealing here with an injunction to recover possession brought under Act No. 43 of 1913 (Session Laws, p. 83), as amended by Act No. 11 of 1917 (Session Laws, Vol. II, p. 220), but with the ordinary proceeding authorized by the Injunction Act, approved March 8, 1906 (Comp. Stat. 1911, secs, 1354 and 1363, pp. *et seq.*).

We know that the plaintiff averred that it is the record owner of the parcel in question, and that it is in possession thereof. We now add that it maintains in its brief that it not only alleged but also proved those facts.

We also know that the defendants acknowledged that the plaintiff was the owner of the Esperanza Estate, with the exception of the mangrove parcel really in dispute herein, which was granted to the original owner of the property, subject to certain conditions that were not fulfilled, and in consequence of such default, the property reverted to the Spanish Crown, and subsequently passed to the People of Puerto Rico, which is now in possession thereof.

If the defendants could lawfully answer as they did, and raise the defense they set up in their answer, there is no doubt that the pleadings present a real conflict with respect to the ownership title and the fact of possession, and it becomes necessary to examine the evidence introduced in order to properly adjust that conflict.

In its argument under the first assignment, the appellant in its brief says:

"If this Hon. Court carefully examines the record, and especially the complaint and the answer of defendants William P. Kramer and Valeriano Torres, it will find that there is nothing in this case to justify the belief that the People of Puerto Rico is a necessary party to this proceeding. Although it is true that the above-mentioned defendants have appeared and alleged that the land on which the trespasses are being committed belongs to the People of Puerto Rico, and that the latter holds the title to said land, it is no less true that the People of Puerto Rico has not appeared to file any pleas whatsoever, nor has it requested leave to intervene in the proceeding, and therefore the ruling of this Hon. Court in the case of *Central Victoria* v. *Kramer*, 35 P.R.R. 168, is strictly applicable herein."

Further on, in discussing the third assignment of error, the appellant says:

"We have already stated that this is a proceeding instituted by the plaintiff against Kramer, Flores, and González, in their private capacity, to enjoin certain trespasses committed by them to the prejudice of the plaintiff and in violation of its property rights.

"An injunction, as is the case with all equitable proceedings, is a proceeding *in personam*, and, in the instant case, it is directed exclusively against the said defendants. In the complaint, no mention is made of the People of Puerto Rico, and we can not understand how in a case such as the present one, where it is sought to restrain the commission of tortious acts by persons who call themselves agents of the Government, such fact, that is, the *descriptio personae,* can convert the action into one wherein the People of Puerto Rico is a necessary party."

Appellant cites in support of its contentions the cases of *Osborn* v. *Bank of United States,* 6 L. ed. 204, and *United States* v. *Lee,* 27 L. ed. 171, decided by the Supreme Court of the United States.

Let us see first whether the *Central Victoria* case, *supra,* when applied to the facts of the instant case, has the scope attributed to it by the appellant.

In their brief, the appellees say:

"At no time have we claimed that the People of Puerto Rico is a necessary party defendant in the instant case; for the simple reason that the People of Puerto Rico could not be sued (without its con-

sent.) What we have asserted is that the real party in interest in the case at bar is the People of Puerto Rico ,and this as a basis for our averment that the acts of defendants Kramer and Flores were official acts and not personal acts, and also to support our defense, that the, acts of these officers were not performed arbitrarily but in pursuance of the authority conferred upon them by the law and the offices they filled.''

And to support their contention that in the instant case the question has been raised in a different manner than in the *Central Victoria* case, they add:

''In said case there was a special appearance, something in the nature of a demurrer to the complaint, on the ground that the defendants were public officers. Of course, if the defendants acted tortiously, their acts were *ultra vires* and did not bind the sovereign,. and they were personally responsible therefor. In the instant case, however, we have tendered an issue by denying plaintiff's title and possession; by invoking the interest of the People of Puerto Rico; by showing that the acts of defendants Kramer and Flores were necessarily incidental to their official duties; by showing the title of the People of Puerto Rico and the possession it held from time immemorial; and by invoking and establishing the defenses of laches. and estoppel. And besides our pleadings, we introduced strong and conclusive evidence.''

We think that the two cases can be distinguished. In stating the applicable rule in the *Central Victoria* case, *supra,* this court speaking through Mr. Justice Wolf said:

''There are two lines of decisions. One of them in its essence holds that when a defendant is truly acting in his representative capacity as the agent of the Government his acts are to be considered as the acts of the Government. *In Re Ayers et al.,* 123 U. S. 443; *Minnesota* v. *Hitchcock,* 185 U. S. 373. The other line of decisions. is that when an agent acts tortiously he can not defend himself behind the shield of his supposed official authority. *Hopkins* v. *Clemson College,* 221 U. S. 636, and cases; *Louisville & Nashville R. R. Co.* v. *Burr,* 44 L.R.A. (N. S.) 189.''

Although in the instant case it was alleged that the defendants forcibly entered upon the land in question, an averment which places the case among those involving personal acts,

in reality the answer sets forth facts which, if true, would place it in the line of cases wherein the courts are convinced that it is not the person who, availing himself of his office, acts and invades the rights of citizens, but the Government itself who intervenes through its officers when the latter act in the exercise of their authority and in the discharge of their duties.

It seems really just not to deny a citizen legal relief against an invasion of his rights by public officers, by allowing the latter to be shielded by the privilege, acknowledged to the state, of immunity from suit without its consent, but it also appears just not to apply this principle so as to nullify that privilege, by compelling the People to appear and submit to the jurisdiction of the courts in all cases. To hold otherwise would be to abrogate the doctrine laid down by the Supreme Court of the United States in the case of *People* v. *Rosaly*, 227 U. S. 270.

We shall now proceed to examine the cases cited by the Supreme Court of the United States and invoked by the appellant. The first of these is *Osborn* v. *United States Bank*, 22 U. S. 737. The opinion of the Court was delivered by Mr. Chief Justice Marshall, and Mr. Justice Johnson dissented. Among other principles, it established the following (to quote from the syllabus):

"In general, an injunction will not be allowed nor a decree rendered against an agent, where the principal is not made a party to the suit; but if the principal be not himself subject to the jurisdiction of the court (as in the case of a sovereign state), the rule may be dispensed with.

"A court of equity will interpose by injunction, to prevent the transfer of a specific thing, which, if transferred, will be irretrievably lost to the owner, such as negotiable securities and stocks.

"The circuit courts of the United States, have jurisdiction of a bill brought by the Bank of the Unites States, for the purpose of protecting the bank in the exercise of its franchises, which are threatened to be invaded, under the unconstitutional laws of a state; and as the state itself cannot, according to the 11th amendment of the

constitution, be made a party defendant to the suit, it may be maintained against the officers and agent of the state, who are intrusted with the execution of such laws.

"A state cannot tax the Bank of the United States; and any attempt, on the part of its agents and officers, to enforce the collection of such tax against the property of the bank, may be restrained by injunction from the circuit court."

In the course of the opinion, at page 842, the Chief Justice, speaking for the majority of the Court, said:

"If the state of Ohio could have been made a party defendant, it can scarcely be denied, that this would be a strong case for an injunction. The objection is, that as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited, to show that a court of chancery will not make a decree, unless all those who are substantially interested, be made parties to the suit. This is certainly true, where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles, to say, that the law could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him, could his principal be joined in the suit. It is admitted, that the privilege of the principal is not communicated to the agent; for the appellants acknowledged that an action at law would lie against the agent, in which full compensation ought to be made for the injury. It being admitted, then, that the agent is not privileged by his connection with his principal, that he is responsible for his own act, to the full extent of the injury, why should not the preventive power of the court also be applied to him? Why may it not restrain him from the commission of a wrong, which it would punish him for committing? We put out of view the character of the principal as a sovereign state, because that is made a distinct point, and consider the question singly as respects the want of parties. Now, if the party before the court would be responsible for the whole injury, why may he not be restrained from its commission, if no other party can be brought before the court?"

That was a case involving a question—the unconstitutionality of a statute—which in itself constituted an exception.

In such a case, as the acts of the officer are *ultra vires,* they can not be considered as the acts of the sovereign. That fact can be determined without the necessity of suing the sovereign, by considering only the acts of the person, who calling himself its agent, really is not such.

The other case relied on is that of *United States* v. *Lee,* 106 U.S. 196. There the opinion of the Court was delivered by Mr. Justice Miller; Mr. Chief Justice Waite, Mr. Justice Bradley, Mr. Justice Wood, and Mr. Justice Gray dissenting. The dissenting opinion was written by Mr. Justice Gray. The principles established by that decision, to quote from the syllabus, were as follows:

"The doctrine that, except where Congress has provided, the United States cannot be sued, examined and reaffirmed.

"That doctrine has no application to officers and agents of the United States who, when as such holding for public uses possession of property, are sued therefor by a person claiming to be the owner thereof or entitled thereto; but the lawfulness of that possession and the right or title of the United States to the property may, by a court of competent jurisdiction, be the subject-matter of inquiry, and adjudged accordingly.

"The constitutional provisions that no person shall be deprived of life, liberty, or property without due process of law, nor private property taken for public use without just compensation, relate to those rights whose protection is peculiarly within the province of the judicial branch of the government. Cases examined which show that the courts extend protection when the rights of property are unlawfully invaded by public officers.

"In ejectment, the title relied on by the defence was a certificate of sale of the demanded premises to the United States by the commissioners under the act of Congress for the collection of direct taxes. The certificate was impeached on the ground of the refusal of the commissioners to permit the owner to pay the tax, with interest and costs, before the day of sale, by an agent, or in any other way than by payment in person. *Held,* that when the commissioners had established a uniform rule that they would receive such taxes from no one but the owner in person, it avoids such sale, and a tender is unnecessary, since it would be of no avail.

*"Bennett* v. *Hunter,* 9 Wall. 324, *Tacey* v. *Irwin,* 18 id. 549, and *Atwood* v. *Weems,* 99 U. S. 183, re-examined, and the principle they establish held to apply to a purchase at such a tax sale by the United States as well as by a private person."

There is no doubt that those principles favor in part the contention of the appellant. We say in part, because never has it been gone as far as is sought by the appellant in the instant case. It has been held that the controversy may be decided on the merits, without the appearance of the state, by judging the acts of the officer; but not that the officer may not allege the legality of his acts, and if he proves it, that the case may not be decided in his favor.

The doctrine laid down by the Supreme Court practically compels the state to appear and defend through its agent. That is why it should be restricted to cases involving the unconstitutionality of the statute under which the public officer claims to act, or to cases, such as *United States* v. *Lee, supra,* where the unfairness of the state was so manifest that the issue had to be finally decided in the furtherance of justice. But where the defense set up by the officer reveals that he is acting within his legitimate powers, it being evident that the state is the only real party in interest, and that the right of the state is not a mere pretension but has a real basis, then there is no invasion of the right of the citizen by the officer, and the general rule should be applied acknowledging that the state can not be sued without its consent, and the action should be dismissed after going into the merits thereof for the purpose of judging the conduct of the officers.

What we have said implies that the defendants herein were entitled to answer in the way they did, and to plead the defenses which they set up in their answer. Did they prove them?

It may be conceded that, as regards the title to the parcel in question, the plaintiff made out a *prima facie* case in its favor, but analyzing the evidence adduced by the defendants

it must be acknowledged that it strongly controverts plaintiff's title, to such an extent that, if the controversy were to be decided on the merits, it might perhaps be determined in their favor. With respect to the fact of possession, the evidence introduced by both parties was conflicting.

The certificates of the registrar of property presented by both parties, show that the original Esperanza Estate was recorded for the first time on May 29, 1880, in the Registry of Property of Humacao, Volume for Naguabo, in favor of Mr. Guillermo Noble. It had an area of 1,059 acres and comprised several parcels, one of which contained 91 acres "of public lands (*terrenos baldíos*), granted under a title issued by His Excellency the Chairman of the Superior Board of Public Lands on the twenty-eighth day of June of the year eighteen hundred and seventy-nine." And thus, through successive transfers, it was acquired by the plaintiff in 1909.

From a certificate issued by the Commissioner of the Interior, offered in evidence by the defendants and admitted by the court without objection on the part of the plaintiff, it appears—

"That according to the records on file in this Department 'The People of Puerto Rico' owns by virtue of the Act of the Congress of the United States of America, approved on July 1, 1902, 'Authorizing the President to reserve public lands and buildings in the island of Porto Rico for public uses, and granting other public lands and buildings to the Government of Porto Rico and for other purposes,' the following property: RURAL—Parcel of mangrove swamp (*manglar*), located in the ward of 'Daguao', municipal district of Naguabo, containing 69 hectares, 24 ares, and 99 centiares, equivalent to 176.19 acres, bounded on the north by land pertaining to the Esperanza Estate, owned by the Fajardo Sugar Company; on the south by the sea; on the east by the aforesaid land of the Esperanza Estate belonging to the Fajardo Sugar Company; and on the west by land of Behn Brothers, separated therefrom by Quebrada Palmas, the exact description by metes and bounds being thus: (Here follows the description.)

"As a part of the swamp land just described, there is a parcel of public land (*baldíos*) which, on June 28, 1869, was granted by the

Superior Board of Public Land Grants (*Junta Superior de reparti-miento de terrenos baldíos*) to Mr. Guillermo Noble, under a title issued in his favor on that date, which textually reads as follows:

" 'The Superior Board of Public Land Grants, created by the Royal Decree of December 28, 1818.—Whereas by virtue of the Royal Order of June 11, 1863, it is incumbent on His Excellency the Chairman, to issue titles signed by His Excellency and attested by the undersigned Secretary.—It appearing from the proper record and the resolution adopted on the eighteenth day of the instant month of June, that Mr. Guillermo Noble, a farmer residing in the District (*Partido*) of Naguabo, was granted ninety-one and sixty-four hundredths acres of public land, situated in the ward of Daguao, in Cienagueta, in the said district, pursuant to a survey of said land, made in accordance with the requirements set forth in the resolution of the Board, adopted on March twenty-third of last year, as appears from the aforesaid record, the report of said survey being as follows: —'The undersigned Land Surveyor.—Does hereby certify: That the location of the boundaries (*deslinde*) of the land granted to Mr. Guillermo Noble, formerly existing as public land located in the ward of Daguao in Cienagueta is as follows: (Here follows the description by points, degrees, and distances.)'' Therefore, on behalf of the Executive Power of the Nation, the beneficial ownership of the aforesaid land is hereby granted to Mr. Guillermo Noble, for him to possess and enjoy the same as the true owner thereof, subject to the compulsory condition of revocation of this grant and reversion of the title to the state, upon his failure to cultivate for the benefit of agriculture, one-tenth of the land within the precise period of one year, one-fourth thereof within four years and one-half thereof within ten years; and subject to the further condition that within a period of not more than two months, counted from the date hereof, he must commence the cultivation of the said land granted to him, in which case his possession shall not be disturbed nor his ownership challenged, but on the contrary, he shall be protected and defended by the territorial judges and other authorities, who are hereby urged and required to act accordingly; and the grantee herein shall pay the land taxes. Let him be put in possession at once by the territorial judge, and the proper record made hereof, after entry on the records of this Local Administration of Revenue and Customs.—Given in Puérto Rico, under my signature, and countersigned by the subscribing Scrivener of War, Secretary of this Superior Board, this twenty-eighth day of June of the year eighteen hundred and sixty-nine.—Sanz.—Antº. Ma. de Aldrey—Sec'y—Pto. Rico, July 5/869—Copy.'

"Inasmuch as neither the grantee, Mr. Guillermo Noble, nor his assigns have complied with the compulsory condition of cultivation imposed by the grant, for the aforesaid parcel remains in its original state of swamp land (*manglar*), said grant has ben declared forfeited and the land has reverted to the state, by virtue of section 3 of the Regulations governing grants of unappropriated lands in the Island of Puerto Rico, approved by Royal Order No. 254 of April 17, 1884, published in the Gazette of Puerto Rico of May 13 of the same year, said section 3 reading as follows:

" 'Section 3.—All grants (*concesiones*) of lands generally, and especially those made from the year 1850 until the present time, wherein the conditions imposed have not been fulfilled, are declared forfeited and the lands restored to the State.'

"The said section 3 was amended by Royal Order No. 469 of August 20, 1888, which was published in No. 122 of the Gazette of Puerto Rico, of October 11, 1888, and which literally copied reads as follows:

" 'The Colonial Ministry, on August 20th last, has notified this General Government of the following Royal Order No. 469:

" ' ''Your Excellency—His Majesty the King, and in his name the Queen Regent of the Kingdom, having learned of the resolution adopted by the Superior Board for the Improvement and sale of unappropriated lands of that island, relating to the amendment of section 2 of the Regulations of April 17, 1884, and of section 12 of the Instructions issued for the execution thereof, of which Your Excellency forwarded a copy with the official communication No. 175 of the 9th of last May; and being in accord with the recommendations of the State Council in full (*en pleno*), has been pleased to decide:— 1st.—That no amendment shall be made to section 2 of the Regulations, nor to section 12 of the Instructions. 2d.—That section 3 of the Regulations is hereby amended so as to read as follows:—'All grants of lands generally, and especially those made from the year 1850 until 1884, wherein the conditions imposed have not been fulfilled, are hereby declared forfeited and the lands restored to the state, unless the grantees shall have been in possession thereof for over 30 years, which is the term provided for the prescription of uncultivated lands possessed without title, according to the preceding section.'

" ' ''By Royal Mandate I inform Your Excellency of the foregoing for all proper purposes.''

" 'And the promulgation thereof having been ordered by His Excellency on the 9th of May, pursuant to his instructions the within

notice is inserted in this official publication, for the information of the public.

" 'Puerto Rico, October 6, 1888.—(Sgd.) Fernando Fragoso, Secretary of the General Government.' "

The oral evidence introduced by the plaintiff consisted in the testimony of Messrs. McCormick, Cruz, Sabat, Kramer, Grago, and Figueroa, who stated, in short:

McCormick, that he is cultivation manager of The Fajardo Sugar Growers Association, which owns the property "La Esperanza"; that, among other kinds of land, it owns mangrove swamps (*"poyales de manglares"*) from which stakes and poles are cut and on which some persons have entered to cut timber at the request of defendant González; that whenever anyone was seen cutting timber there, he sent somebody to stop such persons, who sometimes went away and at other times refused to leave. With reference to defendant Flores: "He is the forest ranger of that district, and sometimes he goes there, when persons have been sent to cut mangrove trees, and claims that he has a right to do so." They enter by the seashore and by Quebrada Palmas. They have cut or cleared approximately fifteen acres. Upon being shown a letter written in 1919 by Attorney Sifre on behalf of the Fajardo Sugar Co. of P. R., requesting permission from the Commissioner of Agriculture to cut poles in the mangrove swamps of "Piñero, Santa Rita, Mata Redonda, Fortuna, Esperanza, and Mount Ida," which letter was admitted in evidence over the objection of the plaintiff, and upon being asked if he had any knowledge of it, he answered: "As I stated a short while ago, I did not know whether permission had been requested concerning the 'Esperanza,' but I knew that permission had been requested in regard to certain swamp lands which the company had leased; but I did not know that any request had been made with respect to the 'Esperanza.' " Upon being asked: "But that part from which the mangrove trees were cut, was it a part of the property 'Esperanza,' owned by William Noble or Gui-

llermo Noble; or do you not know it?'' he answered: ''I never had anything to do with those details; I was concerned only with the body, the main part of the property.'' He acknowledges the defendants, Kramer and Flores, to be Government employees, of whom he is a friend. They have bothered him as such employees. To reach the mangrove swamp where the fifteen acres of timber were cut, one must. go either by the sea or the river, in a boat. He has been field supervisor for ten years. He recalls that, in 1920, a Government engineer, Benítez, came and inspected the mangrove swamps. He did not receive any notice regarding a survey in 1923. The person in charge of the office of the corporation is Mr. Jorge Bird.

Cruz, a foreman of the plaintiff, knows Flores and González. The latter has cut timber in the ''Esperanza'' by order of the former. He told Flores not to cut any more and he answered that he would continue cutting. Flores is a Government forest ranger and intervened in that capacity. The timber is taken to the sea by way of the river shore. For several years he has known González as a dealer in firewood produced on those mangrove swamps. ''It is since last year (1925) that that firewood business has reached the largest volume.'' He has been foreman for five years. He thinks that when he began work as such foreman, Flores was already a forest ranger.

Sabat, a watchman employed by the plaintiff, has orders not to allow anyone to enter the mangrove swamp. ''While I was on duty I heard somebody cutting wood in the forest (*monte*) and I went to notify the foreman. He ordered me to return to the place and stop anyone doing it. I went there to stop them, and Flores asked me if I had an order to do so and who had given it; I told him it was given by the foreman, and then he answered that he would not stop so long as I did not have an order from the Forest Service.'' He met Flores in the mangrove swamp sometime in or about the year 1923. He was in charge of the laborers who did the

cutting; he directed them. The witness has never seen González in the mangrove tract. He inspects it every day. The tide enters it.

Kramer, the defendant called as a witness by the plaintiff, is the Chief of the Forest Service. His work consists in the administration and supervision of the insular forests. Flores is the man in charge of the forests in the district of Ceiba. The difficulties he has had with the plaintiff consist in "the interferences by employees and laborers of the Fajardo Sugar." His department has issued orders for the cutting of timber on the mangrove swamps of Daguao, Municipality of Naguabo. "Mr. Valeriano Vega was in charge of the supervision of the work and Mr. Antonio González was the contractor; he had a contract to cut the timber." The difficulties he has encountered in the exploitation of the mangrove swamp in the Esperanza Estate began in 1922. Before that time the plaintiff had not bothered him.

Grago, an engineer, was called for the purpose of introducing in evidence a copy of the map of the Esperanza Estate, drawn by Surveyor Nin Martínez. It was admitted over the objection of the defendants.

Figueroa, who already knew Flores, "because I used to cut stakes in the 'Oriente' and 'Esperanza' properties and several times he ordered me to stop doing so. He filed a complaint against me, and at the trial held in Ceiba I was acquitted of cutting stakes by order of the corporation.

Morales, McCormick, García, Kramer, and Flores testified as witnesses for the defendants.

The testimony of Morales, official surveyor of the Department of the Interior, is long and difficult to summarize. In 1919 he was ordered to survey the forests and mangrove swamps in the eastern portion of the Island. He began at Punta de la Lima, Naguabo, in the Mount Ida mangrove swamps and continued up to the mouth of the Fajardo River, in the Santa Rita swamp, after crossing through the Esperanza, Oriente, and Mata Redonda swamps. He

surveyed the Esperanza parcel in 1920. The Forest Service was in possession thereof through its agent in charge, Flores. The latter showed him its boundaries. "All the adjoining owners were called upon and personally notified to be present at the survey." He personally went to the Fajardo Central for the purpose of calling on Mr. Jorge Bird and requesting of him the delivery of the plans of the properties, and Mr. Bird suggested that he should see the comptroller, Mr. Candal, who gave him the plans of several properties, including "La Esperanza," and told him that Mr. Sifre had the deed in San Juan. He personally saw Mr. Sifre, who showed him the title-deeds and he made a copy of the same. He made the survey. The Esperanza mangrove swamp contains 176 acres, and is bounded on the north by land of the Esperanza Estate, on the south by the sea, on the west by the Esperanza Estate and land of the Cruz Succession, and on the east by the river called Quebrada Palmas. He made a map of the land surveyed. It consists entirely of a mangrove swamp washed by the tide. He was assisted by Flores and three other persons named Parrilla, Vázquez, and García. "There was some grazing land (*"malojillo"*) about which we did not want to argue with the Central, but which in reality belongs to the People of Puerto Rico." They left it out "because it is not wholly covered by the mangrove swamp proper. He was not interrupted by the agents of the plaintiff; on the contrary, some of them, one of the foremen lent me a boat to cross to the Media Luna Islet." There was no opposition. He had an opportunity to talk with Mr. Jorge Bird, and he keeps the communication "sent to the latter with reference to the survey of that land." He personally conferred with him and with Mr. Sifre. The letter was sent to Mr. Bird by mail and it was not returned. It was shown to him, and he identified the map made by him. Certain cross marks which appear thereon are stakes placed by him on the land in order to mark out the limits of the mangrove forest. The

grazing land (*malojillo*) does not appear in the map, it is located in the west; "it was a place where they had cut the mangrove trees, and that is why we acknowledged it and left it to them."

Answering a question propounded by plaintiff's attorney in regard to the information on which he based his survey, he stated: "Here is an inventory of forests (*inventario de montes*) which I consulted for all the necessary data; here, on page 8, it says: Statement of unappropriated lands (*terrenos baldíos*) and state forests of record in the archives since eighteen hundred and sixty; and from this I took the data."

Answering a question put to him by the attorney for defendant González, as to whether that was the Esperanza parcel, he stated: "Yes, sir. East, the sea; west, Oriente Estate; the Oriente Estate is adjoining to the Esperanza Estate, as testified by Mr. McCormick. Oriente of Sandon or Sandoz. Measured area 23.58 h. Your Honor, here is the date of the taking of possession: December 3, 1878, ten years after the execution of that title, and, as it appears from the book, upon their failure to fulfill the conditions the Government seized the land."

The map to which the witness had referred was admitted in evidence over the objection of the plaintiff.

The trial was continued to another day, when it was resumed with Mr. Morales on the witness stand. He answered questions propounded by the attorney for the plaintiff, in part, as follows:

"Witness, did you state yesterday that you had made this map?— Yes, sir.—How did you make it?—Well, in accordance with the declaration of seizure (*acta de incautación*); by going upon the premises and taking the points with the tachymeter.—In accordance with the declaration of seizure?—Yes, sir.—Is that the document that was introduced in evidence yesterday?—Yes, that act.—The one in the book?—Yes, the one in the book.—Does the description of that property appear here?—Partially, that is, the mangrove swamp, because that 91 acres forms part of the swamp land which the People of Puerto Rico owns there.—According to this map, what is the area

of the property described here?—One hundred and seventy-six and nineteen-hundredths acres, that is the total area of the mangrove swamp of 'La Esperanza'."

He stated that in drawing the map he took into account the grant of the Spanish Government to Mr. Noble, and that the land was a part of that mangrove swamp.

Answering the question put to him by plaintiff's attorney, "Do you state that Mr. Flores was in possession of that parcel?" he answered: "Yes, sir, because he had workmen there; he cut trees, and he was not disturbed by anyone. I went there with him, we surveyed the entire bed of the Quebrada Palmas, from within the bed itself, we came out by the seashore, then turned around, staying on the premises for about two weeks, and I never saw anyone from the Central, nor any other person, interfere in any way; he was in charge there . . . I knew that said mangrove swamp was in his custody because I was directed by my chief to get in touch with that gentleman, who (was) the one having charge of the swamp land.

While he was surveying the property he observed that firewood was cut and sold under the supervision of Flores.

Mr. McCormick, being called by the defendants, testified again. He ratified his previous statement that Mr. Jorge Bird Arias, who is connected with the Fajardo Sugar Company, is the representative in Puerto Rico of the plaintiff, The Fajardo Sugar Growers Association.

Floirán García was one of the workmen who assisted the engineer, Morales, in the survey of the mangrove swamps, and it took them several months to accomplish this work. Referring to the Esperanza mangrove swamp, he stated that it was in possession of the forest ranger Flores; that for the survey thereof paths were opened by cutting the bushes that interfered and driving in stakes; that all of the land surveyed consisted of salt-water swamp land, washed by the tide. They measured many acres, and they spent several days on this work without being disturbed by anyone. The

Government paid him. He saw the employees of the plaintiff and they saw him; but they did not say nor prohibit anything.

It was stipulated by the parties that the witnesses Parrilla and Vázquez, workmen who had also assisted Morales in the survey, if present would testify to the same effect.

The defendant Kramer again testified. He stated that besides being Chief of the Insular Forest Service, which is under the Department of Agriculture of the Island, he is connected with the Forest Service of the United States. He knows well the boundaries of the Esperanza mangrove swamp. He has been on the premises a long time. From 1921 to 1926, many times. Periodically they have cut mangrove timber there. The Government receives large profits from the exploitation of the swamps. "On the Esperanza mangrove swamp we have cut during the last two years approximately five thousand tons, covering an area of from thirty to thirty-five acres." They do the cutting scientifically. He is a graduate in Forestry. "We have made several contracts with Mr. González in connection with the exploitation of the Esperanza parcel." At present "we have a contract with Mr. González, who is here in court." The Esperanza mangrove swamp is "lowland, near the sea, and usually covered by water, and I have waded through that water."

On cross-examination by the attorney for the plaintiff, he testified thus:

"Do you say that the Forest Service of Puerto Rico is in possession of the Esperanza mangrove swamp?—We have been in complete possession of the Esperanza mangrove swamp.—On what facts do you base your statement that you are in complete possession of the Esperanza mangrove swamp?—As we send men to cut timber on that mangrove swamp, we derive benefit from it; and secondly, that we prosecute all trespasses committed on that swamp.—Have you been disturbed at any time in the cutting of timber by any person from the Esperanza Estate?—Yes, we have been disturbed.—How; in what way?—The Fajardo Central has sent men to interrupt or stop the work we are doing in that mangrove swamp, especially during the

absence of the forest ranger.—When you say Fajardo Sugar Company, do you mean the Fajardo Sugar Growers Association?—It may be so, we only know the Central Fajardo.''

The defendant Valeriano Flores Vega also testified. He stated that he was an insular forest ranger, and that in his official capacity he is in possession of land belonging to the People of Puerto Rico, all mangrove swamps, among them the Esperanza mangrove swamp, since 1919 when his predecessor delivered it to him. He has never been dispossessed. Said mangrove swamp contains 176 acres. The mangrove trees grow in salt water. The Prieto Channel is in the center of the Esperanza mangrove swamp. He knows that in 1921 the Government surveyed the mangrove swamp. This was done by Morales. The witness took him there. Upon being asked, ''Do you know whether preliminary to the survey any steps were taken in connection with the adjoining owners?'' he answered: ''Yes, sir; the engineer went personally with me ánd he officially notified the owners of land adjoining the mangrove swamp, and they gave their consent.—Whom can you recall among them?—I can recall Mr. Zalduondo, the Succession of Veve, at Fajardo. —Whom did you see from the Fajardo Sugar?—We saw Don Jorge; but Don Jorge stated to the engineer that he should see the attorney for the Central concerning certain questions; he is Mr. Sifre and lives in San Juan, and then, I could not accompany him there.—Do you know whether Mr. Morales was molested during the time he was there?—At no time. All the employees were very courteous to him.''

The survey was made openly, in the daytime, and in the presence of all the adjoining owners. The cutting of the mangrove trees is done scientifically. They have cut timber on the Esperanza mangrove swamp. Only matured trees are cut, which would spoil if they were not cut. The new vegetation is protected. On several occasions he was bothered by employees of the plaintiff, a couple of laborers, against whom he filed complaints. He is in possession of

the mangrove swamps. He protects them, inspecting them weekly.

On cross-examination by counsel for the plaintiff, he testified in part as follows:

"You say that when you went to make the survey the adjoining owners were notified?—Yes, sir.—That you notified Zalduondo and Veve and the Fajardo Sugar Co.—And other adjoining owners.— Those land owners that you have mentioned, do they own land adjoining the Esperanza property?—Not all of them; only some.— Which ones?—Well, the Behn Brothers, represented by Mr. Mariano Alburúa. And Mr. Jorge Bird, who is the representative of the Fajardo Sugar Growers Association, was notified, and the Cruz Succession was also notified as adjoining owners to that parcel.—Is it true or not that the Fajardo Sugar Growers, through its agents, has cut, almost continuously, timber from that mangrove swamp?—No, it is not true; it has cut but only sometimes.—How many times are sometimes?—Well, I have detected them doing it only twice; and they have been brought into court."

Mr. McCormick, upon being recalled by the plaintiff, asserted that the plaintiff has been in possession of the mangrove swamp pertaining to the Esperanza Estate, inspecting it and cutting spikes, stakes, and crossties on it during the fifteen years that he has been working there.

The defendants then recalled the witnesses Kramer and Flores. Kramer stated that upon taking charge of the Esperanza mangrove swamp, he found it in excellent condition. If any cutting had been done he would have noticed it. He textually said: "I am ready to testify that before nineteen hundred and twenty-three, no cutting of any importance had been effected in the Esperanza mangrove swamp for a period of five years." Flores testified thus:

"In your capacity as forest keeper of the Esperanza mangrove swamp, did you have any dealings with the Fajardo Sugar Growers Association?—Yes, sir.—On what date?—Towards the end of the year nineteen hundred and nineteen; from nineteen twenty and up to twenty-one.—With respect to the Esperanza mangrove swamp, what dealings did you have with the Fajardo Sugar Growers Association, in your capacity as forest ranger?—In accordance with an author-

ization or contract that the Fajardo Sugar Growers Association had entered into with the Forest Service of Puerto Rico, I have sold timber for posts monthly to the Esperanza and Oriente Estates (*colonias*).—From which mangrove swamps?—From the Esperanza mangrove swamp.—Did they know that that timber came from that mangrove swamp?—Yes, sir.—Who came to transport the timber?—The carts from the Esperanza Estate.—Where was the timber cut?—In that same Esperanza mangrove swamp.—What persons carried away that timber?—The laborers and cartmen of the company.—Did you see any of the foremen about?—Yes, the foremen came to receive the material and to deliver it to the laborers.—The foremen of the Esperanza Estate itself?—Yes, sir.''

Upon being cross-examined by plaintiff's counsel, he deposed as follows:

"Did you see the sales contract that the Forest Service had with the Fajardo Sugar Growers Association?—The contracts are in the office of the Forest Service, and in that of the Fajardo; but I had orders to deliver the timber and I took receipts from the foremen, and then, I would go weekly to the office of the Fajardo Sugar to collect the price of the timber sold by me.—And that mangrove timber, where did you get it from?—The contract covered various parcels, timber being cut on the Esperanza, Mount Ida, Boca del Daguao, Fortuna, Mata Redonda, and Santa Rita swamps; in all those places I had to deliver the timber cut.—Who cut that timber?—The laborers of the Fajardo Sugar Company, and the foremen received the material. I collected the charges fixed by the Government; the amount charged by the Government to the Fajardo Sugar as fees for cutting timber.''

Thus ended the evidence introduced. That submitted by both parties shows that the 91 acres of swamp land in question were granted to plaintiff's predecessor in interest, in the year 1869, and that at his request said grant was recorded in the registry in 1880, and that up to the present time said record has not been canceled; that the record contains specific reference to the grant, and that the latter was made subject to the compulsory condition of revocation of the grant and restoration of the land to the state upon the grantee's failure to have under cultivation, for the benefit of agriculture, one-tenth of the land within the precise period

of one year, one-fourth thereof within four years, and one-half thereof within ten years; and that the grantee did not fulfill the condition within the specified time or at any subsequent time, as the swamp land has remained in its original condition, that is to say, as land where mangrove trees grow and is continuously washed by the sea or inundated by the tides. *The People* v. *Dimas et al.,* 18 P.R.R. 1019, 1029.

The evidence for the defendants further tends to show that on December 3, 1878, the Government seized the swamp land conditionally granted because the grantee had failed to comply with the condition, and it has been in the possession thereof ever since. This land was again surveyed in or about 1921, with notice to, and without objection from, the plaintiff and its exploitation has been carried on without any other obstacles than a few interventions by the plaintiff that occurred but a short time before the filing of the complaint, and after having contracted with the Government in regard to the purchase of timber from its mangrove swamps, among others, the parcel at ''La Esperanza''.

Under these circumstances, we do not think that the district court acted incorrectly in denying the preliminary injunction sought by the plaintiff.

When this case was discussed in conference among the members of this court, the question arose as to whether or not the decision of the U. S. Circuit Court of Appeals for the First Circuit, in *People of Puerto Rico* v. *Livingston,* 47 F. (2d) 712, was applicable.

We have carefully read the majority opinion in said case, delivered by Judge Wilson, and the minority opinion, delivered by Judge Anderson, and we hold the view that even though one may notice certain points of similarity between both opinions, the principles set forth in that of the majority are not decisive herein, in the sense of giving to the mere fact of registration of the plaintiff's title such force that it should be considered as establishing in an indisputable and conclusive manner its right to the mangrove parcel in question.

We have also studied the decision of this court in the case of *People* v. *Riera,* 27 P.R.R. 1, on which rests to a large extent the majority opinion of the Circuit Court in the *Livingston* case, *supra,* for the purpose of the construction to be given to the principles of the Mortgage Law involved, but we do not think that by reason thereof, the contentions of the defendants in the instant case must necessarily be rejected and a decision rendered in favor of the plaintiff; especially when the examination we have now made of the cited case leads us to doubt whether, by virtue of the entries appearing in the registry itself and the nature of the land involved, Riera was really a third person without notice of the defects in the title of his predecessor in interest.

In any event, the question involved herein should be considered and decided on its own merits, keeping in mind the nature of the proceedings in which it has been raised. The *Livingston* and *Riera* cases, *supra,* were actions of revendication brought by the People of Puerto Rico against certain defendants who not only held titles recorded in the registry but also were in the possession and enjoyment of the lands in dispute. The instant case is one of a preliminary injunction wherein it has been alleged—and strong evidence offered in support of the allegation—that plaintiff's predecessor in interest had lost the possession of the mangrove parcel before a record had been effected, and that the plaintiff, by itself, has never held such possession, but on the contrary has committed acts which imply a denial of the right that it now claims.

From the certificate issued by the Registrar of Property of Humacao and introduced in evidence by the plaintiff itself, it appears that the first record of the Esperanza Estate, described as "consisting of one thousand and fifty-nine and ninety-four hundredths acres, more or less, . . . of lowland, mountain land, and mangrove swamps," was made on May 29, 1880, in favor of Mr. Guillermo Noble, by virtue of his statements set forth in a declaratory deed which he had

executed in April of the same year. Noble appeared before a public notary and, after furnishing the latter with all the suggestions, antecedents, and documents that were deemed necessary, he consolidated several properties into one, and thus consolidated, he recorded them in the registry. In so far as now pertinent, the registration reads as follows:

". . . and ninety-one and sixty-four hundredths acres, originally public lands (*baldíos*) according to the title issued by His Excellency the Chairman of the Superior Board of public lands, on the twenty-eighth day of June of the year eighteen hundred and sixty-nine. The aforesaid parcels of land belong to Mr. Guillermo Noble and Látimer by virtue of the titles and reasons stated; all of which he verifies before the subscribing Notary herein, by means of the original deed aforesaid, kept in the protocols of Naguabo, and the originals of the proceedings and title issued by the said Superior Board of public lands and which have been exhibited to the said notary during the execution of the within deed."

It will be remembered that, according to the evidence offered by the defendants, as Mr. Noble failed to comply with the compulsory condition of cultivation imposed, the land granted to him was seized by the state, prior to 1880, and hence when Mr. Noble recorded the grant in that year upon his own declaration, such grant had ceased to have any force by itself or otherwise, because Mr. Noble had lost the possession which had been delivered to him in 1869.

We think that no one can maintain that Noble, by virtue of the inscription, if the facts are as indicated, could have acquired anything for himself.

But it is argued that the Mortgage Law is a law for the protection of third persons, and that those deriving title from Noble, who appeared as owner in the registry, obtained a valid title to the parcel of land in question.

Let us see what articles 33 and 34 of the Mortgage Law expressly provide:

"Art. 33.—Instruments or contracts which are null under the law are not validated by their admission to record. -

"Art. 34.—Notwithstanding the provisions of the foregoing article, instruments or contracts executed or entered into by a person who, according to the registry, has a right to do so, shall not be invalidated with regard to third persons after they have been recorded, even though the interest of such party should subsequently be annulled or terminated by virtue of a prior deed which was not recorded or for reasons which do not clearly appear from said registry.

"Only by virtue of a recorded instrument may another later instrument, also recorded, be invalidated to the prejudice of a third person, with the exceptions mentioned in article 389.

"The provisions of this article shall at no time apply to an instrument recorded in accordance with the provisions of article 390, unless prescription has validated and assured the interest to which said instrument refers."

Does the title of the People of Puerto Rico appear in the register? Did the third persons who purchased have notice from the registry that Noble had not fulfilled the condition of cultivation, indispensable to the acquisition of a perfect title?

In our opinion, before any effective right could have been recorded in the registry in favor of Noble, the compliance on his part with said condition should have been stated. The grants were made in accordance with laws and regulations then in force which formed part thereof, and of which not only Noble but also, necessarily, the subsequent purchasers had notice. Said purchasers can not allege that they were not informed, and consequently the default prejudiced them as much as it did Noble. Furthermore, the title of the state was practically recorded in the registry at the time Noble recorded his grant. And it is by reason of such previously recorded title that the defendants alleged that the People were in the actual and undisputed possession of the mangrove land in question. If that title prevails it may prejudice third persons, according to the law itself.

But even if that were not so, it would always result that the state reacquired the possession and control of the swamp land prior to the original record thereof, for it was

not bound to record its title, since the property involved belonged to it by the right of public domain with which it is vested; that Noble recorded a property which he did not possess; that although the plaintiff acquired the title on which it relies in 1909, or more than 20 years ago, it never took possession of the swamp land either. The registry of the property was not created for the purpose of recording therein nonexistent rights. It is true that it protects third persons, but always starting from the basis that something real does exist. Here the only real thing in existence was the mangrove parcel, which, it may be said, from the very beginning warned the plaintiff that it could not acquire any title because the grant made to its predecessor in interest had been forfeited. In a case less strong than the present one, this court considered as paramount the possession held by the defendants, as owners, for over 30 years, as against a title recorded in the registry in favor of the plaintiff, and decided the case accordingly. We refer to the decision in *Pesquera* v. *Fernández,* 22 P.R.R. 49.

In short, the facts as they appear from the evidence of the defendants are as follows:

The state, as owner of a certain swamp land, granted it to a private person in 1869, upon the compulsory condition that the land was to be reclaimed for cultivation within specified periods of time. As this condition was not fulfilled, it re-entered and took possession of the property, occupying the same ever since.

The grantee, after the lapse of the grant and the loss of the actual possession held by him, appeared before a notary public, exhibited to him an instrument evidencing the grant, together with other documents tending to prove the acquisition of other adjoining lands, and executed a deed declaring the ownership which he presented and recorded in the registry in 1880. Without the actual possession of the swamp land having ever been reacquired, the property was sold to three different persons who never took actual possession

of the swamp included in the description of said property. And now, after the lapse of fifty years from the time the original owner reacquired the possession thereof, which it retained, the present owner of the consolidated property upon learning that it appears from the registry that the parcel in question still forms a part of said property, claims the ownership thereof.

In view of the above facts, no other decision can properly be rendered than to affirm the order of the district court denying the issuance of the preliminary injunction sought by the plaintiff against the defendants.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.

Mr. Justice Wolf, dissenting.

In my opinion, the case of *People of Porto Rico* v. *Livingston,* 47 F. (2d) 712, is decisive of this one. It can not be distinguished by the fact that Miss Livingston remained in possession of her property. If the efforts of some of the officers of the Interior Department had prevailed, the possession would have been taken from her. When the right of possession is clear, the accident of a deprivation of material possession should not avail. The complainant had a duly recorded title and the right to possession followed, at least *prima facie*. Therefore, it was necessary for the Government to show that the complainant was not a third person. The *Livingston* case makes it clear that a purchaser may rely on a recorded title. Nor because of an attempt made in 1878 to declare the concession ended was the right of a third person destroyed. A purchaser was not bound to inquire into the possibilities of a defeasance. *Torres* v. *Lothrop, Luce & Co.*, 16 P.R.R. 172, 231 U. S. 171. In my opinion, the acts of the agents of the Government in 1921 or otherwise did not amount to taking possession of the property, and the attempts of supposed agents of the People to take possession would at best come under the category of

acts merely tolerated. Section 446 of the Civil Code (Comp. Stat. 1911, p. 644).

Insisting a little more on the supposed defeasance, there is nothing in the record to show that Guillermo Noble had any notice of the so-called *"incautación."* A declaration of a revocation of a grant does not take effect until communicated to the grantee. *Non constat* that the Spanish Government, with or without the intervention of Guillermo Noble, abandoned its proposed seizure or *"incautación."* I maintain, besides, that there is no *"incautación"* without actual entry, and this does not appear from the record.

I am authorized to state that Mr. Justice Aldrey agrees with this opinion.